[L. A. No. 7965. In Bank.—April 28, 1925.]

JOHN S. CHAMBERS (RAY L. RILEY), as Controller, etc., Respondent, v. JOHN M. LARRONDE et al., Appellants.

[1] INHERITANCE TAX — TRANSFERS IN CONTEMPLATION OF DEATH— SUFFICIENCY OF EVIDENCE. — In this action to determine the inheritance tax on certain transfers alleged to have been made in contemplation of death, it is held that the evidence was ample as a matter of law to support an inference that the transfers were made "in contemplation of death" and "in lieu of testamentary disposition," and hence the findings of the court on those issues of fact cannot be disturbed on appeal.

[2] ID.—TAXABILITY OF TRANSFERS — LAW GOVERNING.—It is the law in force at the time transfers are made that determines the question of taxability.

[3] ID.—ACTS OF 1905 AND 1911 — CONSTRUCTION. — The inheritance tax acts of 1905 and 1911, so far as the phrase "in contemplation of death" is concerned, were intended by the legislature to cover identical cases and this phrase must be construed as applying to a transfer of property, the transferor having in mind the

2.   See 26 R. C. L. 206.
3.   See 24 Cal. Jur. 454.

general expectancy of death which ordinarily actuates one in the execution of his will.

[4] ID. — TRANSFER IN CONTEMPLATION OF DEATH—MEANING.—For a transfer to be "in contemplation of death" it is not necessary that the transferor be in fear of immediate death from an existing malady, as in a gift *causa mortis*.

[5] ID.—EVIDENCE—MANAGEMENT OF PROPERTY BY OTHERS.—The fact that a decedent had, for many years before the transfer of her property to her children, little to do with the management of the property, leaving this to one of her daughters, is not necessarily opposed to a finding that the transfer was made in contemplation of death; and this is also true of evidence that she led a simple life and was inactive, socially and otherwise, and that she had little or no occasion for the use of money or property.

[6] ID.—MOTIVE OF TRANSFER — DIFFERENT CONCLUSIONS FROM EVIDENCE—APPEAL.—Although in such a case the evidence might be sufficient to support the contention that the decedent made the transfers in question for the sole purpose of assisting her children, the trial court having reached a contrary conclusion, it cannot be maintained on appeal that the findings should have been that the transfers were not made in contemplation of death.

[7] ID.—INTENT OF TRANSFERS.—The fact that there was no discussion or mention of death in connection with transfers of property is not necessarily opposed to a conclusion that the decedent acted under an undisclosed intent to secure to her children the entire, undiminished fruits of her life's work while, at the same time, attempting to avoid the imposition of an inheritance tax and the expenses of probate incident to a testamentary disposition of her property.

[8] ID.—FAILURE TO RESERVE CONTROL OF PROPERTY.—The fact that deeds to property were delivered without reservations or retention of any control of the property does not preclude the conclusion that the conveyances had in fact been made "in contemplation of death," as the latter phrase is sufficiently broad to cover any and all transfers of property, whether gifts *inter vivos* or *causa mortis*, from one person to another in contemplation of death or in lieu of testamentary disposition.

[9] ID.—STATUTORY CONSTRUCTION—ACT OF 1911.—The statutory definition of the phrase "in contemplation of death" in the act of 1911 served the purpose of elucidating without changing the law, by giving fuller expression to the legislative intent and meaning.

(1) 37 Cyc., p. 1567, n. 56.   (2) 37 Cyc., p. 1567, n. 54.   (3) 37 Cyc., p. 1567, n. ·54.   (4) 37 Cyc., p. 1567, n. 56.   (5) 37 Cyc., p. 1567, n. 56.   (6) 37 Cyc., p. 1567, n. 56.   (7) 37 Cyc., p. 1567, n. 56.   (8) 37 Cyc., p. 1567, n. 56, 57.   (9) 37 Cyc., p. 1567, n. 54.

4.  See 26 R. C. L. 225; 24 Cal. Jur. 456.

APPEAL from a judgment of the Superior Court of Los Angeles County. Victor R. McLucas, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ward Chapman and L. M. Chapman for Appellants.

Ralph W. Smith, Inheritance Tax Attorney, Erwin P. Werner, Assistant Inheritance Tax Attorney, Adrian C. Stanton and Wesley E. Marten for Respondent.

LAWLOR, J.—The State Controller brought this action to determine the inheritance tax on certain transfers alleged to have been made during her lifetime in contemplation of death by Juana Larronde, the decedent herein.

It appears that Juana Larronde died July 27, 1920, in her eighty-fifth year. She was survived by two sons, John M. Larronde and P. D. Larronde, and four daughters, Antoinette Larronde Watson, Madeleine Etchemendy, Marianne T. Etchemendy, and Carrie Etchemendy. For some time before her death she had been possessed of considerable property, both real and personal. Prior to the year 1909, the exact date of which is now unknown, she had executed a will, under the terms of which all her property was to be distributed equally amongst her said six children. On two different occasions during the months of August and September of the year 1909 the said decedent, accompanied by her six children, visited the offices of her attorney, at which times she, by a series of transfers and conveyances, disposed of her entire property to her several children or by deed of trust for their benefit. At the times these dispositions were made the decedent was seventy-four years of age and apparently in good health. The devolution of the property was accomplished by the execution of the following deeds and declaration of trust: On August 13, 1909, she conveyed by deed to her four daughters, above named, an undivided two-thirds of several tracts of real property in Los Angeles County, share and share alike, and on the same day transferred to said four daughters certain corporate stock, share and share alike; on September 8, 1909, she conveyed to three of her daughters, omitting Antoinette Larronde Watson, and to John M. Larronde, one of her sons, the title to

her home place in the Mott tract, in the city of Los Angeles, share and share alike. On September 8, 1909, she conveyed to Madeleine Etchemendy and Carrie Etchemendy her remaining undivided one-third interest in the real property as to which the two-thirds interest had been conveyed to her daughters as above indicated, together with certain corporate stock, in trust, however, for the benefit of her two sons, John M. Larronde and P. D. Larronde, share and share alike. Under said instruments the properties were divided in the same manner and in the same amounts as they were by the will above referred to. It was also upon the occasion of one of these visits to her attorney that the decedent destroyed the will theretofore executed by her. At a later date, to wit, July 2, 1914, decedent being then seventy-nine years of age, the trust agreement of 1909 was revoked, presumably with the consent of all the parties thereto, and a new declaration of trust was executed by her. No change in the provisions thereof was made other than by the substitution of the Title Insurance & Trust Company as trustee in the place and stead of the two children, Madeleine Etchemendy and Carrie Etchemendy named as such under the former declaration of trust; the personal property covered by said former declaration of trust was not included, but transferred directly to Madeleine Etchemendy, one of the children. The recordation of the 1909 deed was deferred until July 2, 1914. All of the transfers took immediate effect in possession and enjoyment, the decedent neither reserving a life estate nor insuring to herself, in writing, support and maintenance. Notwithstanding this, however, Madeleine Etchemendy testified, and the testimony was not controverted, that it was understood by the entire family, including the decedent, that she was to be cared for by them during the remainder of her life.

The court referred the matter to an inheritance tax appraiser, before whom a hearing was had, at which the testimony of the grantees and beneficiaries was taken. At the conclusion of the hearing the inheritance tax appraiser reported the value of the property and computed the total tax to be $5,064.58. The appellants thereupon filed objections and exceptions to the report and, by stipulation of the parties, the issue was submitted to the superior court upon the stenographic report of the evidence taken at the hearing

before the referee. The court, after an introductory statement, found from such evidence as follows:

"1. That Juana Larronde died on or about the 27th day of July, 1920, and was at the time of her death a resident of the county of Los Angeles, State of California.

"2. That on or about the 13th day of August, 1909, decedent above named, made, executed and delivered to Antoinette Larronde Watson, Madeleine Etchemendy, Marianne T. Etchemendy and Carrie Etchemendy, respondents herein, deeds to real property described as follows: [It will serve no purpose to set out said descriptions which are given at great length in the transcript, folios 106–112] said transfer having been made to said respondents share and share alike; wherein and whereby said decedent transferred and conveyed all of her legal right, title and interest in and to said property to said respondents; said real property, as of August 13, 1909, was of the value of $137,628.00.

"That on or about the 13th day of August, 1909, said decedent transferred and assigned all of her legal title in and to the personal property described as follows, to said respondents last above named, share and share alike: [Enumeration omitted as not necessary] which said personal property, as of August 13, 1909, was of the value of $67,560.00.

"3. That on or about the 8th day of September, 1909, decedent above named, made, executed and delivered to John M. Larronde, Madeleine Etchemendy, Marianne T. Etchemendy and Carrie Etchemendy, respondents herein, deeds to certain real property, wherein and whereby said decedent transferred and conveyed all of her legal interest in and to said property to said respondents, share and share alike, and which said property is described as follows: [Description unnecessary] which said real property, as of September 8, 1909, was of the value of $6000.00.

"4. The court further finds that all of the transfers of the real and personal property hereinabove mentioned were made without valuable or adequate consideration and in contemplation of death and in lieu of a testamentary disposition.

"5. That on or about the 2nd day of July, 1914, decedent herein made, executed and delivered to the Title Insurance & Trust Company, one of the respondents herein named, a deed wherein and whereby said decedent transferred and

conveyed and assigned all of her legal title in and to that real and personal property, described as follows: [Description omitted], which said real property, as of July 2, 1914, was of the value of $77,460.01; subject however, to the terms of a certain trust agreement known as Declaration of Trust, Number 3215 of Trusts of the said Title Insurance & Trust Company, to the said Title Insurance & Trust Company to hold for the use and benefit of John M. Larronde and P. D. Larronde, respondents herein, share and share alike.

"6. That each and all of the above described transfers were made without valuable or adequate consideration and in contemplation of death and in lieu of a testamentary disposition."

As its conclusions of law from the foregoing facts the court stated:

"1. That each and all of the transfers herein described were made without valuable or adequate consideration and in contemplation of death and in lieu of testamentary disposition.

"2. That the clear market value of the transfers, made by this decedent, both real and personal, was $329,114.68.

"3. That said property passed to the following named persons, whose relationship to decedent, the character and clear market value of whose respective interests at the time of the death of said decedent, and the inheritance or transfer tax due thereon are as hereinafter shown: [Then follows a table setting forth the figures enumerated].

"3. That the amount of inheritance tax due the state of California in this estate, is the sum of $5,064.58.

"4. That the objections and exceptions to the report of the inheritance tax appraiser as referee, on file herein, are overruled and the said report is hereby sustained and confirmed in each and every respect."

Respondents (appellants here) thereupon appealed to this court, basing the appeal "exclusively on the following points:

"1. That the finding that said conveyances were made in 'contemplation of death' is in direct contradiction of the direct and unqualified evidence presented in the record and not disputed or questioned in any manner.

"2. That the finding that said transfers were made 'in lieu of testamentary disposition' is contrary to the uncontradicted evidence and not warranted by any reasonable inference that might be drawn from the uncontradicted testimony.

"3. But even if there were a justifiable inference from the testimony that the transfers were made 'in lieu of testamentary disposition,' yet such transfers were not made taxable until the enactment of the statute of 1911, and as all the transfers in this case were made prior to that time, they were not subject to taxation.

"4. The finding of the court that the properties transferred in trust to the Title Insurance and Trust Company for the benefit of the two sons was not made until July 2, 1914, is not supported by the evidence, for it is undisputed that the same properties had been transferred in 1909 to two of the daughters in trust for the sons, and the transfers to the Title Company in 1914 were but the substitution of a new trustee and a continuation of the trust previously created."

By way of answer to the foregoing contentions, the respondent Controller advances the following:

"1. The transfers are taxable because every presumption is in favor of the judgment.

"2. The transfers are also taxable because the definition of 'contemplation of death' written into the 1911 'Inheritance Tax Act' by the legislature clarified this phrase, indicating the ever and continuing intent of the legislature to make it applicable to transactions of this character.

"3. The transfers are also taxable because they were made in contemplation of the death of Juana Larronde.

"4. The transfers are also taxable because the decedent in destroying her will simultaneously with the execution of the gift deed and declaration of trust in 1909 substituted the said deed and declaration of trust as a means of testamentary disposition in lieu of her said will."

Madeleine Etchemendy testified in part as follows, which testimony was accepted by her brothers and sisters as a true statement of the facts contained therein, and upon which respondent relies to sustain the claim that the transfers were made "in contemplation of death."

"Q. Did she leave a will? A. No. Q. Had she made one that you know of, which had nothing to operate upon, or

which she destroyed prior to her death? A. She destroyed her first will, many years ago, probably at the time she made this trust that would be. Q. In 1909? A. That was the first will she had made. She had made it a few years before. Q. Had she made any will after that? A. No. . . . Q. I believe you stated that she destroyed her only will about 1909? A. Yes. Q. At about the time these deeds were made? A. Yes. Q. Have you ever seen that will? A. I think I heard it read when she signed it. Q. Was the distribution under that will to six children equally? A. Yes; just the same. ·Q. Is the general effect of the trust and the outright deeds to convey all of Juana Larronde's property to the six children as nearly equally as in the nature of things could be done? A. I think so. Q. Probably not penny for penny, but that was the general intent? A. I believe it is penny for penny; it could not have been more equally. Q. And the will would also have conveyed it equally to the six children? A. Yes; to the six children. . . . Q. In her discussions with you or any of the children, concerning the transfer of this property, did she ever make any remarks in regard to what would be done with it when she passed away? A. No; only at the time she made it. Miss Norton: She made a will, though? Had she had a will for many years? A. I don't remember that; I think she had; she must have made the will after Mr. Larronde died. Mr. Pennock: Were you present when she destroyed it? A. Yes. Q. Who else was present? A. I think my sister. Q. What did she say at that time? A. She said these papers took the place of the will and she did not need the will any more. Q. And she never made another? A. No. Q. Had nothing to operate on? A. No. Miss Norton: She always intended the children to have the property anyway? A. Yes. . . . Q. At the time of her death did Juana Larronde own an interest in any property whatsoever? A. None whatever; she was dispossessed of everything. Q. Neither real nor personal? A. Neither. . . . Q. After this property was transferred in 1914—I might ask, after the property was transferred in 1909, Juana Larronde had practically transferred all her property, both real and personal? A. Yes. Q. Did she have any property whatsoever left after that time? A. No. . . . Q. Then the same properties placed in trust in 1914 had been placed in trust prior to that, in

1909? A. Yes. Q. With what company? A. Naming myself and my sister Carrie as trustees. Q. Oh, individual trustees? A. Yes. Q. Then that trust was revoked? A. Yes. Q. By Juana Larronde? A. Yes, and with the consent of the two brothers. Q. Were they beneficiaries? A. Yes. Q. All the parties to the trust agreed to have it revoked? A. Yes. Q. When? A. 1914. . . . Mr. Pennock: Q. The terms are practically the same as this other trust, you say? Now, the personal property mentioned, the stocks, did not go into this trust of 1914? A. No. Q. And when this trust was revoked, with the consent of all parties, what was done with regard to the stocks mentioned in there? A. (Madeleine Etchemendy.) It was transferred to me; I hold the bank stock. Q. That is all the stock which was mentioned in there, and which I read off, was transferred to you by Juana Larronde? A. Yes. Q. About what year was that—1914? A. 1914, I think. Q. At the time the change was made in the trustees? A. Yes. Q. And were those stocks transferred to you along with any instrument in writing? A. No; I am just holding them in my name as owner, and I divide the dividends. It is a family affair; I divide the dividends with my brothers. . . . Q. Had any one of you, the daughters and sons of Juana Larronde, ever entered into any agreement with Juana Larronde whereby you were to return to her, or account to her for, or render to her any part of the income from any of these properties? A. No; we made no agreement with her at all; she gave it outright to us; she said she trusted us, had confidence she would be cared for by her children. . . . Q. Did she for some time prior to the transfers discuss her intentions with you and the children? A. Yes, she spoke of it. Q. What did she say? A. That it was to be ours; we were her children and it was to be our property. Q. But what did she say bearing upon her reasons, as near as you can remember? A. You mean deeding the property? As I said before, she wished to make us a gift of the property and free herself of the care and responsibility of keeping the property. She did not wish to have any cares whatever. Q. Did she say anything regarding what her expectations of support and maintenance would be after deeding the property? A. No; she always said she was to be taken care of by us; she knew we would take care of her. . . . Mr. Pennock: You were designated,

were you not, Miss Etchemendy, in the trust of 1914, as the agent for your brothers and sisters? A. Yes. Q. Were you also acting in the capacity of agent for your mother? A. Yes. Q. And had been for a number of years, more or less her agent? A. Yes; and was with my stepfather, too. Q. Of the six children you were the one she looked to to take care of the details? A. Yes, and my brother John was also an agent with me; he used to collect the rents. Q. Did your mother ever have any other agent acting for her, in regard to any of these properties, than yourself and your brother John? A. No. . . . Mr. Pennock: Did she ever talk over business with you at all after 1909? A. Oh, she gave us a talk, but nothing she took part in. Q. She did not display any interest in it? A. No. Q. Just trusted you to take care of it? A. Yes. Q. You actually had looked after it for a good many years? A. Since I was sixteen years old, I think. Q. Making the trust did not change the actual arrangement? A. No; not at all; the trust was created at the request of my two brothers. Q. Of your mother? A. Yes. Q. Who suggested making the trust in the first place? A. My mother but it was with their consent, that is what I meant. Q. Miss Norton: The general consent of all concerned? A. Yes.''

[1] We are satisfied that the foregoing evidence is ample as a matter of law to support an inference that the transfers were made ''in contemplation of death'' and ''in lieu of testamentary disposition,'' and hence that the findings of the court on those issues of fact cannot be disturbed.

[2] We have already quoted appellants' third contention, that these transfers were not taxable under the 1905 act, which in point of time should govern; it being conceded they would be taxable if made subsequent to the enactment of the 1911 act. It is true, as appellants assert, ''it is the law in force at the time the transfers were made that determines the question of taxability.'' (*Estate of Brix,* 181 Cal. 667 [186 Pac. 135].) For the purposes of the decision it may be assumed that all the transfers come under the 1905 act. Section 1 thereof (Stats. 1905, p. 341) reads as follows: ''All property which shall pass, by will or by the intestate laws of this state, from any person who may die seized or possessed of the same while a resident of this state, or if such decedent was not a resident of this state at the time

of death, which property, or any part thereof, shall be within this state, or any interest therein, or income therefrom, which shall be transferred by deed, grant, sale, or gift, made in contemplation of the death of the grantor, vendor or bargainor, or intended to take effect in possession or enjoyment after such death, to any person or persons, or to any body politic or corporate, in trust or otherwise, or by reason whereof any person or body politic or corporate shall become beneficially entitled, in possession or expectancy, to any property, or to the income thereof, shall be and is subject to a tax hereinafter provided for, to be paid to the treasurer of the proper county, as hereinafter directed, for the use of the state; . . . ''

Section 27 of the 1911 act (Stats. 1911, p. 726), referring to the phrase ''in contemplation of death'' used in the taxing part of that act (Stats. 1911, sec. 1, p. 713), provides in part: '' . . . The words 'contemplation of death,' as used in this act, shall be taken to include that expectancy of death which actuates the mind of a person on the execution of his will, and in nowise shall said words be limited and restricted to that expectancy of death which actuates the mind of a person in making a gift *causa mortis;* and it is hereby declared to be the intent and purpose of this act to tax any and all transfers which are made in lieu of or to avoid the passing of the property transferred by testate or intestate laws.''

[3] In our view the 1905 and 1911 acts, so far as the phrase ''in contemplation of death'' is concerned, were intended by the legislature to cover identical cases. In other words, the phrase ''in contemplation of death'' as defined in the act of 1911 is merely the equivalent in meaning with that under the act of 1905, which does not purport to define the phrase, for the phrase must necessarily be construed as the language of the act of 1911 imports—a transfer of property, the transferor having in mind the general expectancy of death which ordinarily actuates one in the execution of his will. Appellants contend, however, that the amendment found in the 1911 act had in view a broadening of the scope of said phrase. The following authorities bear on this point: In *Conway's Estate* v. *State,* 72 Ind. App. 303 [120 N. E. 717], the court, in discussing an inheritance tax statute similar to our 1905 act, and construing the undefined

phrase "in contemplation of death" found therein, said: "The words 'in contemplation of death' as used in inheritance tax statutes, do not refer to that general expectation of death entertained by all persons, but they do refer to that expectation of death which arises from such bodily or *mental conditions,* irrespective of the cause in any particular case, which prompts persons to dispose of their property to those they deem entitled to their bounty.

"Those words, when employed in taxation statutes, are not restricted to the technical meaning of such phrases when applied to gifts *causa mortis,* but are given a reasonable and liberal interpretation, which tends to make effectual such taxation laws without destroying the right of the owner of the property to make an absolute gift of the same.

"Gifts, *causa mortis,* come within the provisions of the statute, and likewise gifts *inter vivos* made in contemplation of death. . . .

"Several States preceded Indiana in the enactment of inheritance tax laws, and our statute, in its general provisions, is similar to most of such statutes, particularly those of the states of Illinois, New York, Wisconsin and *California.*" (Italics added.)

Also, in the *Estate of Reynolds,* 169 Cal. 600 [147 Pac. 268], Mr. Justice Henshaw, writing the opinion, said, in referring to the amendment of section 27 of the 1911 act: "This amendment also served the purpose of elucidating without changing the law, by giving fuller expression to the legislative intent and meaning." It was pointed out in the *Estate of Pauson,* 186 Cal. 358 [199 Pac. 331], that the above statement was *obiter dictum,* although not criticised; yet we are prepared to adopt it, for we are of opinion that the definition in the 1911 act did not change the meaning of the phrase.

It may be argued that as the act of 1905 did not contain a definition of the phrase the amendment of 1911 would be unnecessary and superfluous if our conclusion is correct. But this was a matter entirely resting in the discretion of the legislature, for what an enactment shall contain presents a legislative and not a judicial question.

We will now consider the contentions of appellants touching the question of the sufficiency of the evidence to support the findings. It is pointed out that the decedent lived eleven

years after the transfers were made; that she was always in satisfactory health, and that "the only basis for an inference of contemplated death is the advanced age of the decedent—and yet, considering the well-preserved state of her health, her simple habits and clean mode of living, her seventy-four years still left the event of death far in the future." [4] For a transfer to be "in contemplation of death" it is not, as stated, necessary that the transferor be in fear of immediate death from an existing malady, as in a gift *causa mortis*, but, on the contrary, it is conceivable that a person of comparative youth, enjoying perfect health and vigor, may, nevertheless, make a transfer of his property "in contemplation of death" within the meaning of the act. It was declared in *Spreckels* v. *State of California*, 30 Cal. App. 363 [158 Pac. 549], involving the 1905 act: " . . . A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death, that the property so transferred becomes amenable to the burden. Or as counsel for respondents with singular aptness states the proposition: 'It is only when contemplation of death is the motive without which the conveyance would not be made, that a transfer may be subjected to the tax.' That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer. . . . "

[5] The evidence, stressed by the appellants, that the decedent had, for many years before the transfers were made, little to do with the management of her property, leaving this to her eldest daughter, is not necessarily opposed to the findings that the transfers were made in contemplation of death; this is also true of the evidence that she led a simple life and was inactive, socially and otherwise, and that she had little or no occasion for the use of money or property. [6] Assuming that the evidence might be sufficient to support appellants' contentions in regard to the motive which actuated decedent in making these transfers, namely, that the decedent had no use for money or property because of her advanced age and mode of living; that her children were in dire need; that the family relations were not only cordial but affectionate, and that the transfers were, therefore, made for the sole purpose of assisting them, the trial court having reached a contrary conclusion, it cannot be maintained on appeal that the find-

ing should have been that the transfers were not made in contemplation of death.

[7] Conceding, as contended by appellants, "there was no discussion or mention of death in connection with these transactions"; this, however, would not necessarily be opposed to a conclusion that decedent acted under an undisclosed intent to secure to her children the entire, undiminished fruits of her life's work while, at the same time, attempting to avoid the imposition of an inheritance tax and the expenses of probate incident to a testamentary disposition of her property; such considerations would tend to support the findings that the transfers were made "in contemplation of death" and "in lieu of testamentary disposition." [8] Again, conceding "that the deeds were delivered, the transfers vested a present title, and there were no reservations or retention of any control over the properties in any degree whatsoever," still this would not, of itself, preclude the conclusion that the conveyances had, in fact, been made "in contemplation of death." These words, "in contemplation of death," are not narrowed or restricted in any manner by other language in the 1905 act but are, in fact, sufficiently broad to cover any and all transfers of property, whether gifts *inter vivos* or *causa mortis,* from one person to another in anticipation of death or in lieu of testamentary disposition.

In our opinion the evidence in the case, from which the trial court evidently concluded that the transfers were inconsistent with any purpose save that of testamentary disposition; that the decedent retained no property and made no provision for her support; that she distributed all her property equally among her children, and that she died intestate, having at the time the transfers were made destroyed her will, is sufficient to support the findings of the court below that the transfers were made in contemplation of death and in lieu of testamentary disposition. [9] We also think it clear that the statutory definition of the phrase "in contemplation of death" in the act of 1911 "served the purpose of elucidating without changing the law, by giving fuller expression to the legislative intent and meaning."

The judgment is affirmed.

Richards, J., Waste, J., Shenk, J., Seawell, J., and Lennon, J., concurred.