39 Cal.2d 309 (1952)
Estate of LILLIAN T. ADAMS, Deceased. THOMAS C. KUCHEL, as State Controller, etc., Respondent,
v.
EDGAR G. HARKNESS, as Executor, etc., Appellant.
L. A. No. 21872. 
Supreme Court of California. In Bank. 
July 15, 1952.
 Fleming, Robbins & Tinsman for Appellant.
 James W. Hickey, Morton L. Barker and Walter H. Miller for Respondent.
 SCHAUER, J.
 This is an appeal by the executor of the last will and testament of Lillian T. Adams, deceased, from an order of the probate court fixing the inheritance tax due to the State of California. After the appeal was noticed, the executor, Morgan Adams, died, and Edgar G. Harkness thereafter became the duly appointed and qualified executor and has been substituted as appellant in this proceeding.
 The issue to be decided is whether the evidence is sufficient to support the finding of the trial court that a transfer in trust made by the decedent 10 years before her death was made in "contemplation of death" within the meaning of that phrase as used in section 13642 of the Revenue and Taxation Code, prior to the 1951 amendment of that section. We have concluded that the evidence does warrant such finding, and that the order appealed from must be affirmed.
 Section 13642, [fn. 1] at the time of Mrs. Adams' death in 1946, provided that "A transfer conforming to Section 13641 [i.e., "without a valuable and adequate consideration"] and *311 made in contemplation of the death of the transferor is a transfer subject to this part. [fn. 2]"
 " 'Contemplation of death' includes that expectancy of death which actuates the mind of a person on the execution of his will. The term is not restricted to that expectancy of death which actuates the mind of a person making a gift causa mortis."
 After a hearing before the inheritance tax appraiser (see 14502- 14504), the appraiser filed his written report with the superior court (see 14506) in which he listed as taxable the assets of the trust and also included a statement that "The above Trust constitutes a transfer made in contemplation of death, with life estate retained and as an advancement and is taxable under Div. 2, Part 8, Chap. 4, Art. 3 of the Revenue and Taxation Code." (This article 3 includes 13642, quoted hereinabove.) The executor filed objections to the appraiser's report (see 14510), and after a hearing in the superior court (see 14511) that court made its findings of fact and conclusions of law to the effect that the "trust constitutes a transfer made in contemplation of death," and is therefore taxable. The court's order was entered fixing the tax accordingly (see 14513) and this appeal by the executor followed (see Prob. Code, 1240).
 The evidence, contended by appellant to be insufficient to support the finding of the trial court that the transfer was made in contemplation of death, may be summarized as follows:
 In November, 1935, decedent Mrs. Adams, two weeks before her 80th birthday, transferred to an irrevocable trust certain property worth some $300,000. The trustee was Mrs. Adams' only child, her son Morgan Adams, who later became executor and appellant herein. The declaration of trust provided that the income from the trust estate should be paid to Morgan Adams during his life, and thereafter to his two sons (i.e., Mrs. Adams' grandsons) until such times as the two sons reached, respectively, the age of 35 years, when each of such sons would receive distribution of his proportionate one- half share of the trust corpus free of the trust. The trustee was given the further power to distribute the corpus or any portion thereof to his sons at any earlier time he deemed advisable. At the time the trust was created the two grandsons were aged 18 and 20, respectively. Some 10 years thereafter *312 (in 1945) the trustee exercised his power to distribute the trust estate to the two grandsons and to terminate the trust. Mrs. Adams died in January, 1946, at the age of 90 years.
 The property transferred to the trust constituted about three-fourths of Mrs. Adams' fortune, which she had received at the death of her husband in 1922. Mr. Edgar G. Harkness, substituted as appellant herein, is the attorney who drew the declaration of trust for Mrs. Adams. He testified that he had been legal counsel to Mrs. Adams' husband for many years prior to the latter's death, and since that time had been closely associated with and had acted as legal counsel for Mrs. Adams and for her son and two grandsons; that he did not suggest the trust to Mrs. Adams; that "I believe she came into my office and brought up the subject about the boys. The boys was the only thing she had in her mind"; that over a period of two or three weeks prior to preparing the trust declaration he and Mrs. Adams had several discussions concerning the matter, and "I pointed out to her that she was giving away all interest in that property if it was executed. She didn't care anything about that. She was a very intelligent woman, but she was also quite set in her ideas, and she was very much interested in these grandchildren. Naturally, she was afraid that some woman would get ahold of these boys before they were mature enough to know what they were doing, and that they might lose whatever they had. So, we discussed that considerably about their youth and inexperience, and how so many people were anxious to separate rich men's sons from any money that they might receive. And I pointed out also, of course, the legal effect of that trust, and that she would have to pay a [federal] gift tax, because she was giving away whatever she had. ... [S]he wanted to put the property in such a way that she would feel their father could supervise and protect them until they got to a point where they were safe to handle it. This was the one thing she was after. She wanted them established in business safely, and that is about all she told me about the deal. I told her very little except the effect of it, that it was gone as far as she was concerned, that she was going to have to pay a gift tax to do it. ... [S]he wanted Mr. Morgan Adams named as trustee, I believe she wanted him to have the income of the trust. ... Oh, she did say that in regard to Morgan, that on account of the Mortgage Guarantee Company and the large amount *313 of stock that he had in it, that if he should be liable there in stockholders' liabilities, he wouldn't have anything. ... [S]he desired the income paid to her son until such time as it was safe to distribute the corpus of the estate to the grandchildren, and for the further reason that her son might need the income due to the uncertainties caused by the depression then inflicting the nation. ... Q. Did she say to you, either in that discussion or any other discussion, that she was making this gift to avoid inheritance taxes? A. There was no discussion of taxes whatever, except my statement to her that she would have to pay a [federal [fn. 3]] gift tax if she made it." The attorney further testified that Mrs. Adams did not explain to him "why she waited until so late in her life to decide to make this trust," or "how it happened to occur to her right at the time that she created that trust," and that he did not suggest to her that she could herself take care of the grandsons' needs later on when they were ready to enter business; that in his conferences with the accounting firm which handled the Adams family tax matters there was no discussion as to whether or not creation of the trust would save inheritance taxes, that the thought "never even entered my head"; that a federal gift tax return was made and a gift tax paid when the trust was created.
 Morgan Adams, Jr., one of the two grandsons, testified that at the time the trust was created the decedent, Mrs. Adams, told him and his brother that "she wanted to give this money to us so that we would more or less be free to set up our own lives and not be tied down by lack of capital or cash. On the other hand, she thought we were a little young, and didn't want to have us lose our shirt ..., so she wanted to have my father supervise it for awhile"; that at that time both the witness and his brother were in college and were being supported by their father; that the father had been managing Mrs. Adams' "sales of stocks and ... Taking care of her main assets ... for many years prior to" the time the trust was created.
 At the hearing before the inheritance tax appraiser Mrs. Adams' son, Morgan Adams, in answer to the question, "What was her motive in creating that trust?" stated "Well, even at that time she was well along. She was in good health, but I had taken care of her affairs pretty much ever since my father's death and she thought it was a good *314 scheme to make a bequest--I guess that is what it was--at that time on the basis that I would continue to look out for that amount of money, which, of course, I did." When asked whether he needed the income from the trust the witness stated, "It so turned out that I did not, but in 1933 until about 1941 my own affairs were in rather chaotic condition. It might well have been that I would have needed it ..." At the hearing before the probate court the witness further stated, by affidavit, that from his childhood his mother had been a woman of "unusually good health and unusual mental activity ..., she had no serious illness during her lifetime until very shortly before her death in 1946. ... While she was guided and assisted by her husband in her over-all financial affairs until his death in 1922, and by affiant after that time, as far as her personal expenditures--the running of her home, the employment and payment of her servants, and her other diverse civic and social activities--were concerned, these matters were handled entirely by her. ... During the years 1934, 1935 and 1936--being immediately prior to and subsequent to the date of the Declaration of Trust, ... she was far more energetic and industrious in many lines than a much younger woman ..."; that Mrs. Adams traveled to Japan in 1934 and to Panama and Mexico in 1936; that in 1933 she joined a club at the University of Southern California, which focused "on the education of young people and on scholarships and building programs on the campus," and until 1944 took an active part in the organization, attending a business meeting each month; that Mrs. Adams was also active in various other civic, educational, and charitable organizations; that prior to creation of the trust she discussed the matter with the witness and her "thought" as then expressed "was that she desired that both grandsons receive the corpus of the Trust Estate at such time as in the discretion of affiant they were able to properly manage the same--to the end that moneys which they might need to start in business would be available to put them in a financially safe position to start off their business careers," and she suggested that the witness receive the trust income while he continued to support the grandsons and as long thereafter as he felt it wise; that prior to distributing the trust corpus to the grandsons in 1945 he discussed the matter with Mrs. Adams and she approved.
 Other evidence was also introduced to the effect that until a few months prior to Mrs. Adams' death in January, 1946, *315 she was active in social, business, and civic affairs, attended directors' meetings of the company in which she and her son had an interest and when she told him "what she wanted done, it was done"; that she made extended trips both in and out of this country, was in good health and of an alert and cheerful frame of mind, and was planning and contemplating life rather than death. Also introduced were three wills executed by Mrs. Adams. The first, executed in 1922, left all of her estate, except for a $5,000 bequest to a friend, to her son, Morgan Adams. The second will, executed in 1937, left her entire estate to her son. Her final will, admitted to probate herein, was executed in 1941, and left her entire estate in trust to her son, with the income to be by him either paid to his two sons or at his discretion accumulated for their benefit, and with the power in him to distribute the corpus to his two sons and terminate the trust at any time he chose.
 Respondent State Controller does not suggest (and the court did not find) that the statements of the appraiser in the latter's written report to the superior court that Mrs. Adams retained a life estate in the trust corpus and that the trust constituted an advancement are correct, but he does contend that the evidence and permissible inferences to be drawn therefrom are sufficient to support the finding that the trust constitutes a transfer made in contemplation of death. With this contention, bound as we are by the rules governing appellate courts in considering facts on appeal, we cannot disagree, even though it may seem to us, or to some of us, that upon an original weighing of the evidence we might reach a contrary finding.
 In Estate of Newman (1942), 52 Cal.App.2d 126 [125 P.2d 908], the District Court of Appeal, speaking through Mr. Presiding Justice Barnard, thoroughly elucidates the principles to be followed in determining whether such a finding should be upheld. [1] The court there states: "[P. 130] It rather clearly appears from the wording of our statute ... that the words 'contemplation of death' refer to that expectancy of death which actuates the mind of a person in the execution of his will rather than to that general expectation of death which all men have. It is well settled in this state, however, that the phrase in question is not limited to an expectation that death is imminent or that it is likely to occur within a few years. The controlling rules and principles have been sufficiently established in this state *316 and it is unnecessary to consider or analyze the varying viewpoints in the many decisions which have been cited from other states and from federal courts. It may also be observed that in several particulars views expressed in some of the earlier decisions in this state have been somewhat modified or changed, in effect, by later decisions. ..."
 "[P. 131] In Spreckels v. State (1916), 30 Cal.App. 363 [158 P. 549], ... the court said, 'each case arising under the statute in question ... must rest upon its own peculiar facts, and the adjudicated cases can, as a rule, do little, if any, more than to illustrate the application of the law to the particular facts of particular cases.' In McDougald v. Wulzen (1917), 34 Cal.App. 21 [166 P. 1033], an order refusing to tax a transfer was affirmed. The grantor was 83 years old and in reasonably good health. There was evidence that he transferred the property to his wife because it annoyed him to take care of it. The court held the evidence sufficient to sustain the findings although contrary findings, if made, would have had to be sustained ..."
 "[P. 132] In Estate of Pauson (1921), 186 Cal. 358 [199 P. 331], an order fixing a tax was affirmed. The donor, who was 78 years old and in vigorous health, transferred some $600,000 to a corporation practically all of the stock of which he gave to his children. He was voted a salary of $20,000 a year to cover his expenses and died in less than a year from a sudden illness. The court stated that the question of whether or not a gift is made in contemplation of death is a question of fact and that if the evidence justifies an inference that the transfer was or was not made in contemplation of death the finding cannot be disturbed on appeal even though the appellate court might draw a contrary inference from the same evidence. ... The court ... said:"
 " '... the taxing of transfers was purely ancillary to and in aid of taxes imposed upon the right of succession, the purpose of such ancillary legislation being to tax transfers which were made in lieu of succession or testamentary disposition. That the object of such imposition of taxes upon transfers made in contemplation of death is to prevent the evasion of laws imposing a tax upon the right to succeed to an estate at death is conceded in all the cases. It is obvious that this purpose is not achieved when the phrase "transfers made in contemplation of death" is limited, as in New York, to gifts causa mortis. This court, in the Estate of Reynolds, supra, [169 Cal. 600 (147 P. 268)], declined *317 to follow this narrow view. It is equally obvious that the legislative intent will be frustrated if the transfer in order to be taxable must be made with a sense of impending death, for under this view no tax can be collected where a donor in expectation of death and for the purpose of vesting title in his heirs makes a transfer inter vivos with no contemplation of death other than that involved in arranging his affairs so that when the contemplated event occurs the property will be distributed or vested in accordance with his wishes in that event. ...' ..."
 "[P. 133] In Estate of Snyder [1925], 71 Cal.App. 324 [235 P. 54], an order fixing a tax upon a building transferred by a mother to her son was affirmed. The son contended that the impelling motive for the transfer was his mother's desire to have him manage her affairs in accordance with a contract between them, and not her contemplation of death. The court there said:"
 " 'But it is not necessary that the decedent should have made a direct statement of her motives. If the circumstances shown are such as in the mind of a reasonable man might justify the inference that in coming to an agreement with her son, as well as in making said deed, she was actuated by the contemplation of death, that will be sufficient to sustain the court's finding to that effect.'"
 "After observing that 'If it sufficiently appears that interests having relation to the ordinary affairs of life, rather than death, constituted the primary and controlling consideration for the making and ultimate consummation of an agreement to transfer property, the transfer will not be subject to tax,' the court then held that the evidence in that case justified the inference that the probability of the mother's death in the near future 'was an important moving cause' of the transfer."
 "In Chambers v. Larronde [1925], 196 Cal. 100 [235 P. 1024, 41 A.L.R. 980], an order fixing a tax on a large amount of property transferred by a woman 84 years old to her children was affirmed. ... The court ... said that the fact that there had been no discussion or mention of death in connection with making the transfers 'would not necessarily be opposed to a conclusion that decedent acted under an undisclosed intent ...'"
 "In Estate of Boole [1929], 98 Cal.App. 714 [277 P. 759], an order fixing a tax was affirmed. The donor died at the *318 age of 63 and five years after making the transfer in question. While his health had been seriously impaired over a period of five years there was evidence that he had no fear or expectation of immediate death. After stating that the latter fact did not negative the existence of that contemplation of death which is defined in the statute, the court said:"
 " 'The state's burden of proof is to show the motive or motives of the decedent which actuated the transfers. From the very nature of this burden, a case capable of direct proof of the issue will seldom arise. The motive will usually have to be inferred from other facts such as the acts of the decedent, the surrounding circumstances and the nature of the transfer. For these reasons the question is one which is peculiarly within the province of the trial court.'"
 [2] "The question whether or not a gift is one made in contemplation of death is essentially a question as to whether such gift was one in the nature of a distribution of the donor's property or was one which was intended merely as a lifetime favor to the donee. While the solution may depend upon an impelling and inducing motive or motives it does not always depend upon any single motive which controls to the exclusion of all others. [3] Where a contemplation of death is one of the motives, an important moving cause of the transfer, and one without which the transfer would not be made, the transfer is taxable even though other substantial motives may have contributed to the result. [4] If one purpose of the transfer is a distribution of the donor's property as a substitute for testamentary or similar disposition, with the effect of merely hastening or anticipating the effects of what would otherwise be a testamentary or similar disposition, the transfer is taxable. [5] A desire to see a donee have a present use of the property and to have the donee established with a separate competency are not necessarily inconsistent with a transfer of the property in contemplation of death within the meaning of the statute. Such desires and motives may well accompany an intention to make an advanced delivery to a donee of property which the donor intends shall ultimately go to him, that is to say, an intention to make a present distribution of property in lieu of a testamentary or similar distribution. [6] Where the exclusive motive for the transfer is one associated with the continued life of the donor rather than with his death the transfer is not taxable under this *319 statute. But where such a motive, although present, is not exclusive the transfer may be taxable."
 In the cited case (Estate of Newman (1942), supra, 52 Cal.App.2d 126), the decedent during the period he was aged 63 to 65 transferred to his wife, who was some 16 years younger than he, about 73 per cent of his property. He died three years later. Prior to the transfers he had made a will leaving all of his property to his wife with the exception of small bequests to two nieces and two nephews. About a month after the last transfer he made a new will leaving everything to his wife. Other evidence was to the effect that he was generous, of cheerful disposition, in good health at the time of the transfers, and had made the transfers to enable his wife to be financially independent. The court held that in view of the applicable principles the evidence was sufficient to sustain the finding of the superior court that all of the transfers were made in contemplation of death and that the contrary evidence was (p. 135) "not sufficient to compel a finding contrary to that made by the court. The existence of the motives thus indicated and relied upon by the appellant does not establish, as a matter of law, the absence of the other motive, 'contemplation of death,' which is essential here. And there is other evidence which justifies an inference that a contemplation of death at some time in the future was an important moving cause of each of these transfers. The decedent transferred to the appellant over $57,000 worth of property, constituting about 73 per cent of all he had. As the court said in In re Schweinler's Estate, 117 N.J.Eq. 67 [175 A. 71]:"
 " 'As a matter of common knowledge, most men do not divest themselves of their whole estates or a large proportion thereof except as the result of that contemplation of death already discussed. When such a gift is made, therefore, it is more probable than not that it was made as the result of such contemplation.'"
 "The transfer included all of the property owned by the decedent except his interest in the partnership through which he was engaged in business, which was valued at about $21,000. The transfers were made to his wife, who was 16 years younger than he was. She was not only the natural object of his bounty but she was given the bulk of his estate in his first will and all of it in the second will. The first of these wills was executed before any of the transfers were made and the other within a month after the last transfer. *320 The fact that the deceased devised and bequeathed practically all of his property to the appellant, then transferred about three-fourths of it to her outright and then, within a month, made a new will giving her all of his estate, is significant and indicates that throughout all of these transactions he had in mind that expectancy of death at sometime in the future which actuates the mind of a person in the execution of his will, and that one of his motives in making the transfer was to make in advance a partial distribution of his property without waiting for the time when his will should take effect. The question was one of fact for the trial court and, assuming that a contrary finding would have been supported by the evidence, it cannot be held as a matter of law that the evidence and the reasonable inferences that may be drawn therefrom are not sufficient to support the finding made."
 [7] The evidence in the instant case is so similar to that in Estate of Newman as to make it apparent that inferences may reasonably be drawn therefrom which would support the finding of the superior court that the trust created by Mrs. Adams constituted a transfer made in contemplation of death within the meaning of the statute.
 Estate of Minor (1919), 180 Cal. 291 [180 P. 813, 4 A.L.R. 456], and Estate of Darby (1949), 93 Cal.App.2d 96 [208 P.2d 689], relied upon by appellant, have to do with whether the transfers there involved were for a consideration, and are not persuasive here.
 It is urged on behalf of respondent Controller that there is further support for the court's finding in the direct testimony of the son, Morgan Adams, given at a time when he was the executor herein, that when the trust was created Mrs. Adams "thought it was a good scheme to make a bequest--I guess that is what it was--at that time on the basis that I would continue to look out for that amount of money, which, of course, I did." If this were the only evidence tending to support the trial court's finding we might well agree with appellant. As urged by the latter such testimony appears to be "but a legal conclusion of a layman," does not appear to be based on any fact statement made by Mrs. Adams, and is not shown to be more than an "erroneous hearsay statement." But disregarding such statement entirely leads to no other conclusion than that which has been previously indicated. *321
 [8] The Controller has also argued that the presumption provided by section 14512 [fn. 4] is sufficient, standing alone, to sustain the court's finding. Regardless of the effect of such presumption otherwise where the record of the evidence before the appraiser is not before the court, it obviously does not support findings which the evidence does not support. A contrary view would result in giving to the appraiser's report a far greater sanctity than is lent to a court's findings of fact, which of course must find support in the evidence if they are to be upheld on appeal. Moreover, the Controller does not even suggest that the presumption should apply in support of the statements in the appraiser's report that Mrs. Adams retained a life estate in the trust corpus and that the trust constituted an advancement (in either of which events the transfer would be taxable, 13644, 13647).
 For the reasons which have been pointed out the order appealed from is affirmed.
 Gibson, C.J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.
NOTES
[fn. 1] 1. Unless otherwise stated, all section numbers herein mentioned refer to sections of the Revenue and Taxation Code.
[fn. 2] 2. That is, the "Part" of the Revenue and Taxation Code known as the "Inheritance Tax Law." (Rev. & Tax. Code, 13301.)
[fn. 3] 3. The California Gift Tax Law had not yet been adopted when this trust was created.
[fn. 4] 4. Section 14512: "For the purpose of the hearing the report of the inheritance tax appraiser is presumed to be correct, and at the hearing it is the duty of the objector to proceed in support of his objection."