This is an action to recover an inheritance tax on shares of capital stock of several corporations alleged to have been transferred by the deceased, Ezra Thompson, to his children more than six years prior to his death.
After the cause in the above-named estate was closed, a distribution of the property had, the adminstrators discharged, and their bonds exonerated, William D. Sutton, the state treasurer, in such cause, filed his petition, in which he in substance alleged that the deceased, Ezra Thompson, "during the month of March, 1917, was the owner and in possession of real and personal property within the jurisdiction of the state of Utah of the value of more than $1,000,000"; that on that date the deceased, James D. Murdock, William Murdock, Lynn H. Thompson (deceased's son), and Norrine T. Brown (deceased's married daughter), organized a corporation under the laws of this state, called the Thompson-Murdock Investment Company, with a capital stock of $100,000, divided into 1,000 shares of the par value of $100 each; that 498 shares of such stock were subscribed by the deceased, and one share each by his son and daughter; *Page 24 
and that in payment of such stock so subscribed the deceased "transferred certain real estate to the said company of the value of $200,000." Then it is alleged that on March 31, 1917, the deceased, with other members of his family, Lynn H. Thompson (his son), Emily P. Thompson (his wife), Dorothy Z. Thompson (his daughter-in-law), Norrine T. Brown (his married daughter), and H. Ross Brown (his son-in-law), organized a corporation under the laws of this state called the Thompson Investment Company, with a capital stock of $100,000, divided into 1,000 shares of the par value of $100 each, of which the deceased subscribed 995 shares, and the other five incorporators one share each, and that in payment of such stock so subscribed the deceased conveyed to such corporation real estate in Salt Lake City, including his residence, of the value of $635,240, real estate in Park City of the value of $5,000, and 500 shares of the capital stock of the National Bank of the Republic at Salt Lake City of the value of $107,500.
It is then alleged that, after the organization of such companies, the deceased, "by way of gift and without consideration," transferred all of his shares of stock in such companies, except one share in each, to his four children; Lynn H., Clyde R., and Ezra P. Thompson, and Norrine T. Brown (his daughter), giving to each of two of them 123 shares and 124 shares to each of the other two of the capital stock of the Thompson-Murdock Investment Company, and 248 shares to each of two and 249 shares to each of the other two of the capital stock of the Thompson Investment Company; and that such transfers "were made in the nature of a final distribution thereof, and in contemplation of death of said Ezra Thompson, deceased, and were intended to take effect in possession and enjoyment at or upon the death of the said Ezra Thompson, deceased." It was alleged that the conveyances and transfers made by the deceased to the corporations were also made in contemplation of death, and not to take effect until at or after the death of the deceased, and on such theory the state claimed to hold such *Page 25 
corporations also liable for the tax; but such allegations and claim during the trial were abandoned by the state, and hence we need not further notice them.
It is further alleged that on March 17, 1917, the deceased, being the then owner of 200,000 shares of the capital stock of the Cardiff Mining Milling Company, a mining corporation, of the then value of approximately $200,000, by way of gift, and without consideration, "and in contemplation of death," transferred 50,000 shares of such stock to each of his four children.
It is then alleged that the deceased died in April, 1923, and that he, at the time of his death, was 72 years of age; that his sons Lynn H. and Ezra P. Thompson were appointed administrators of his estate, "and that such estate has been closed and said administrators have been discharged."
The petitioner prayed that a citation issue requiring the discharged administrators and the other children of the deceased to appear and show cause why the shares of stock so transferred to them should not be subjected to an inheritance tax, an appraisement made thereof as a basis for such tax, and, for such purposes, to show cause why the cause in the matter of the estate of Ezra Thompson, deceased, should not be reopened. Such a citation was issued. In response thereto the discharged administrators and the other children of the deceased appeared and filed special and general demurrers to the petition and motions to strike portions of it. These were overruled. Then the children filed an answer denying all the material allegations of the petition and specifically denying that any of the transfers were made either in contemplation of the death of the deceased or not to take effect until at or after his death, and to the contrary averred that all of such transfers were made in due course of business at least six years prior to the death of the deceased, and at a time when he was in good and robust health, and to take effect, and did take effect, in possession and enjoyment immediately as bona fide sales or gifts. *Page 26 
The case was tried to the court as one in equity. However, at the request of the petitioner, a jury was called in an advisory capacity. In such capacity the case, at the conclusion of the evidence, was submitted to the jury on instructions by the court. In connection therewith there were also submitted to them thirty-six questions to be, and which were, answered by them. A special verdict was rendered finding that some of the transfers were made in contemplation of death and some not; that some were made not to take effect until at or after the death of the deceased and some not. The trial court, however, regardless of the special verdict and of the findings of the jury, made findings of fact and conclusions of law independently of the special verdict. In such respect the court found: That in March, 1917, Ezra Thompson was the owner and in possession "of certain real and personal property situated in the state of Utah," without further describing it or finding its value; that on that day the deceased, James D. Murdock, W.W. Murdock, Lynn H. Thompson, and Norrine T. Brown organized the Thompson-Murdock Investment Company, a corporation, with an authorized capital of $100,000, divided into 1,000 shares of the par value of $100 each, of which Ezra Thompson subscribed 498 shares, Lynn H. Thompson and Norrine T. Brown, the son and daughter of Ezra Thompson, one share each, the Murdocks the balance, and, in payment of the stock subscribed by Thompson and his son and daughter, Ezra Thompson conveyed to the company "certain real estate situate in Salt Lake county," without further describing it, and without finding the value thereof; that on March 31, 1917, Ezra Thompson, Lynn H. Thompson, Emily P. Thompson, Dorothy Z. Thompson, Norrine T. Brown, and H. Ross Brown organized the Ezra Thompson Investment Company, a corporation, with an authorized capital of $100,000, divided into 1,000 shares of the par value of $100 each, of which 995 shares were subscribed by Ezra Thompson, and one share by each of the other incorporators, Emily P. Thompson, the wife of Ezra Thompson, *Page 27 
and the other incorporators, his children, except H. Ross Brown, his son-in-law, and Dorothy Z. Thompson, his daughter-in-law, and that Ezra Thompson conveyed and transferred to such company "certain real estate," without further describing it or finding the value thereof, and 500 shares of the capital stock of the National Bank of the Republic at Salt Lake City, without finding the value thereof, in full payment of the shares of stock so subscribed of such company; that on April 17 and 19, 1917, Ezra Thompson, "by way of gift and without consideration other than the natural affection of a father for his children, transferred and assigned" to Lynn H. Thompson, Norrine T. Brown, Clyde R. Thompson, and Ezra P. Thompson, his children, each 124 shares of the Thompson-Murdock Company, and to each 248 shares of the Thompson Investment Company, Ezra Thompson retaining one share in each of such companies; that Ezra Thompson, when the corporations were organized and the shares of stock transferred and the gifts made, was 66 years of age, in good physical and mental health and condition, and thereafter continued to live in good health for a period of about 6 years, and continued actively to participate in business affairs until about a month prior to his death, which was in April, 1923; that the transfers of all of such stock to his children "were made by said Ezra Thompson in contemplation of the death of the said Ezra Thompson," and "were intended to take effect in possession and enjoyment at the death of the said Ezra Thompson." No other matter or thing or fact is found to show that the transfers, or any of them, were made in contemplation of death, or intended not to take effect in possession or in enjoyment until at the death of Ezra Thompson. The findings in such respect are made merely in the language of the statute; nor is it found what the value was of such shares of stock at the time of such transfers or at the death of the deceased.
The court further found that in March, 1917, Ezra Thompson was the owner of about 183,000 shares of the capital *Page 28 
stock of the Cardiff Mining Milling Company, a corporation, and that he, "by way of gift and in contemplation of death," transferred and assigned to his daughter, Mrs. Brown, and to his sons Ezra P. and Clyde Thompson, each 50,000 shares of the capital stock of such mining company, of the value of $915,000, and retained unto himself 33,000 shares of such company of the value of $165,000." Again no finding of fact is made to show that such gifts or transfers of stock were made in contemplation of death, except merely in the language of the statute. No findings are made that any of the transfers of stock was made with any restriction or qualification whatsoever, or that Ezra Thompson thereafter had the right to exercise any control or dominion over such shares of stock so transferred, or that he, after such transfers, exercised any control or dominion whatsoever over any of them, or had or received dividends or any use or benefit from them, or had anything whatsoever to do with or concerning such stock.
The court further found that in June, 1911, Ezra Thompson "was the owner of a large amount of capital stock of the said Cardiff Mining Milling Company, and on said day transferred and assigned to his son Lynn H. Thompson 50,000 shares of the capital stock" of said mining company, which were issued in the name of his son and delivered to him, and remained in his possession from thence on, and that Ezra Thompson exercised no dominion or control over or concerning such shares of stock, and that such transfer and assignment were to take effect, and took effect, in possession and enjoyment immediately, and were not intended to take effect in possession and enjoyment only at or after the death of Ezra Thompson.
Thus the court, as conclusions of law, stated that all of the shares of stock transferred by Ezra Thompson in 1917 were subject to an inheritance tax, but that the shares of stock transferred in 1911 to Lynn H. Thompson were not, and rendered judgment accordingly. *Page 29 
From that judgment this appeal is prosecuted by the children. They complain (1) of the ruling overruling their general demurrer, principally upon the ground that it is not alleged in the petition that the shares of stock transferred had any value at the date of the death of the deceased, or what the value of such shares of stock was at that time; (2) that Emily P. Thompson, the widow of Ezra Thompson, deceased, and one of his heirs at law, was an indispensable party to the proceedings, and that she was not made a party, and no citation issued for her appearance; (3) that the court below did not have jurisdiction to reopen the cause in the matter of the estate of Ezra Thompson, deceased, for the purposes for which it was reopened; (4) that the court failed to find upon all of the material issues in the cause, and that the findings of fact made by the court with respect to the issues as to whether the transfers of the stock were made in contemplation of the death of the deceased or not to take effect until at or after his death are mere conclusions of law, and that no findings of fact are made to support them; (5) that the evidence is insufficient to support a finding that any of the transfers of shares of stock were made in contemplation of the death of the deceased, or not to take effect until at or after his death, and that, to the contrary, by the clear and manifest weight of the evidence, if not by all of the evidence, without any substantial conflict, it is shown that none of the transfers were made in contemplation of the death of the deceased, or not to take effect until at or after his death, but that all of such transfers were bona fide transfers, to take effect, and did take effect, immediately in possession and enjoyment.
Our inheritance tax statute, Comp. Laws Utah, 1917, § 3185, in force at the time of the alleged transfers, so far as material is as follows:
"All property within the jurisdiction of this state, and any interest therein, whether belonging to the inhabitants of this state or not, and whether tangible or intangible, which shall pass by will or by the statutes of inheritance of this or any other state, or by deed, *Page 30 
grant, bargain, sale, or gift, made in contemplation of the death of the grantor, vendor, or donor, or intended to take effect in possession or enjoyment at or after the death of the grantor, vendor, or donor, to any person in trust or otherwise, shall be subject to the following tax, after the payment of all debts, for the use of the state: Three per cent. of its market value in excess of $10,000, and not exceeding $25,000, and 5 per cent. of its market value in excess of $25,000; and all administrators, executors, and trustees, and any such grantee under conveyance, and such donee under a gift made during the grantor's or donor's life, shall be respectively liable for all such taxes to be paid by them respectively, except as herein otherwise provided, with lawful interest as hereinafter set forth, until the same shall have been paid. The tax aforesaid shall be and remain a lien on such estate from the death of the decedent until paid. In determining the amount of tax to be paid under the provisions of this section, the debts of the estate shall first be deducted, and the remainder shall be the net estate. Upon all that portion of the net estate in excess of $25,000, the tax of 5 per cent shall be computed. Upon all that portion of the net estate in excess of $10,000 and not exceeding $25,000 the tax of 3 per cent shall be computed; and the court shall determine the amount of tax to be paid by the several devisees, legatees, grantees, or donees of the decedent."
This section, in 1919, 2 years after the alleged transfers, was amended by inserting therein and adding thereto, after the phrase "any person in trust or otherwise," and before the phrase "shall be subject to the following tax," the following: "And,for the purposes of this act, any transfer of a material part ofany such property in the nature of a final disposition ordistribution thereof made by the decedent within three yearsprior to his death, except in case of a bona fide sale for a fairconsideration in money or money's worth, unless shown to thecontrary, shall be deemed to have been made in contemplation ofdeath." (Italics added.)
Thus, as is seen, the statute of 1917 does not in any particular define the meaning of the phrase "in contemplation of the death," nor create nor indicate any presumption with respect thereto, nor make any distinction or 1 reference to a transfer of a material or other part of property of the decedent or otherwise. And, the transfers *Page 31 
admittedly having been made in March and April 1917, the controversy is determinable under the 1917 statute, and not under the 1919 statute. Estate of Potter, 188 Cal. 55, 204 P. 826;Estate of Brix, 181 Cal. 667, 186 P. 135; Lacey v. StateTreasurer, 152 Iowa 477, 132 N.W. 843.
The assignment that the widow ought to have been made a party is overruled. Under our Code, defect of parties is something to be taken advantage of by special demurrer 2, 3 or by answer. The special demurrers were on grounds of ambiguity and uncertainty, and not on grounds of defect or want of parties. Nor was the matter raised by answer. Unless raised by demurrer or by answer, the defect was waived. Nor do we see wherein the widow was a proper, much less a necessary or indispensable, party.
Now, as to the general demurrer. There is no express allegation in the petition as to the value of the shares of stock at the time of the death of the deceased. The value of the shares of stock, 200,000 shares of the Cardiff Mining 
Milling Company, is alleged to have been $200,000 at 4-6 the time of the transfer in 1917. The value of the shares of stock of the Thompson-Murdock Investment Company is only indirectly alleged by the allegations that the deceased transferred to that company in 1917 real estate of the value of $200,000 in payment of 498 shares of stock subscribed by the deceased. So, too, it is alleged that the deceased, in 1917, transferred to the Thompson Investment Company real estate and bank stocks of the value of $747,740 in payment of 995 shares of stock subscribed by the deceased. There is no allegation as to the value of the shares of stock of either the Thompson-Murdock Investment Company or the Thompson Investment Company at the time of the death of the deceased. The state argues that such an allegation is immaterial. We think it is material. We think it not only material to aver and show what the value of the shares was when transferred in 1917, but also what the value was at the time of the death of the deceased. For purposes of taxation, *Page 32 
confessedly the tax is to be computed on the value as of the time of the death of the deceased, and not of the transfer, 6 years prior thereto. That stocks of the character here in question may fluctuate in value is general knowledge; hence no presumption may be indulged that the value of such shares of stock in 1917 was the same, or substantially the same, as in 1923, 6 years thereafter. Yet we think it not unreasonable to infer from what is alleged in the petition as against a general demurrer, that the shares at the time of the death of the deceased had a value in excess of $10,000, or that their then value, together with other property of the estate, was in excess of $10,000. Certain it is that the petition in such respect is frail and in need of considerable presumptive support. Nevertheless we think sufficient is alleged to confer jurisdiction on the court to hear and determine the controversy in such particular. We therefore, with considerable hesitancy, overrule that assignment.
It further is urged that the court did not have jurisdiction to reopen the case in the matter of the estate of the deceased; that the property in controversy was no part 7 of the estate, and that it was not under the control of the administrators, and legally could not be brought in and administered or distributed as part of the estate; and, since under the statute a grantee, transferee, or donee is made liable for the tax on property conveyed and transferred by a decedent in his lifetime, and subject to an inheritance tax, and the court required to determine the amount of tax to be paid by the several grantees, transferees, or donees, and the property so conveyed or transferred charged with a lien for the payment of the tax, to determine which and to enforce the lien, it is contended, required an independent action in equity. Let it be conceded that where, as here, an estate fully settled and closed, and the administrator discharged, an independent action is maintainable, yet it does not necessarily follow, because of our statute relating to the subject and collection of inheritance taxes, *Page 33 
that such an action is the exclusive or only remedy. No authorities are cited by the appellants in support of their contention. As against the proposition the state cites only In re Picot's Estate, 53 Utah, 195, 178 P. 75. Manifestly that case has no pertinency to the matter in hand. Little in the briefs is said either for or against the proposition. We are largely left to work it out ourselves. As the point relates to subject-matter jurisdiction, we may not leave it unnoticed or undecided. We in this state have no independent probate or surrogate court. Our district courts, courts of general jurisdiction, are clothed with power to exercise, and exercise under our probate code, all probate powers and judicial functions. Whether the district court sitting in probate has power to hear and determine the controversy here presented is dependent upon the statute. Let it be conceded that the statute on the subject is not as clear as it might be. Nevertheless, from a consideration of the whole statute relating to the subject or title of our inheritance tax act as well as the title relating to the probate code, we think the subject-matter was within the jurisdiction of the court sitting in probate, especially in view of Comp. Laws Utah 1917, § 3191, of the inheritance tax statute, conferring power upon the district court to enforce the tax, to make and set aside appraisements and order reappraisements, section 3200, forbidding settlements of estates until the tax is paid, and section 3199, making it the duty of executors, administrators, and trustees charged with the settlement of estates subject to the tax to collect and pay it to the state treasurer, and that "applications may be made to the district court by such executor, administrator, trustee, or state treasurer to sell the real estate subject to said tax in an equitable action, or, if made to the court having charge of the settlement of the estate, the proceedings shall conform as nearly as may be to those for the sale of real estate of decedent for the settlement of his debts." Of course it readily is perceived that in such case a controversy or issue respecting title or ownership of property might be involved where *Page 34 
the district court sitting in probate might not have jurisdiction to hear and determine it, and where an independent action either in equity or at law is requisite for such purpose. But that is not now before us, as neither title nor ownership of property is here involved. The only question in such respect is whether the transfers were made under such circumstances as to render the transferees liable for the tax or to charge the property transferred with a lien for the payment of the tax. How long after the estate was closed and the admistrators discharged the petition herein was filed, or whether it was filed within or without the then term of court, is not made to appear. Thus, while an independent action might have been brought, still we think the petition also could have been, as it was, filed in the cause of the matter of the estate of the deceased and presented "to the court having charge of the settlement" thereof, the district court sitting in probate.
Further as to this: The petition as filed was entitled "In the District Court of the Third Judicial District in and for Salt Lake County, State of Utah." In such particular it was entitled as any independent action would have been. The 8 cause, however, was entitled "In the Matter of the Estate of Ezra Thompson, Deceased"; but the real parties to the cause were the state treasurer on the one side and the heirs of the deceased on the other. The issues and controversy as presented by the petition and the answer thereto were between such parties, and were entertained, tried, and determined as an equitable action, and as completely as though the state treasurer had been styled the plaintiff and the heirs the defendants in the cause. The powers exercised by the court in the cause, the procedure adopted, and all of the rights and remedies accorded the parties, were the same as, and no less or different than, had the parties been designated the treasurer as plaintiff and the heirs as defendants in the cause. Thus, looking at substance and not to mere form, the cause as between the parties may well be regarded as one in equity and as it *Page 35 
was entertained and tried by the court. In such view it may well be considered that the court had jurisdiction, not only of the parties, which is not disclaimed, but also of subject-matter. This assignment is therefore also overruled.
This brings us to a consideration of the further grounds, mainly presented and argued and relied on by both parties. The findings of the court that the shares of stock transferred in 1917 were transferred in contemplation of the death of the deceased and not to take effect until at or after 9, 10 his death, being found merely in the language of the statute — that they were transferred "in contemplation of the death of the deceased and not to take effect until at or after the death of the deceased" — are mere conclusions of law without any facts found to support them. Our statute requires the facts found and the conclusions of law to be separately stated. Unless that is done and all the material facts found as disclosed by the evidence which in the judgment of the court and counsel have a bearing upon the question as to what the judgment should be, nothing more is accomplished than by a mere general verdict and the wholesome purpose of the statute frustrated requiring findings and conclusions to be separately found and stated. Such requirement of the statute is just as essential in equity as in a law case. A judgment rendered on no findings, or not upon sufficient or proper findings to support it, has no more validity in equity than in law. Because we have a broader power of review in equity than in law cases does not dispense with the necessity of the trial court to make findings on all of the material facts disclosed by the evidence and controverted by the pleadings. Whether the case is one in equity or at law, the litigants are entitled to the judgment of the trial court as to the facts as well as to the law before invoking the judgment of the appellate court on them. Even in an equity case we ought not to be required to assume the function of determining for the first time the truth or falsity of material and controverted allegations. Nor may a trial *Page 36 
court merely take the evidence and certify the record up for disposition as in the premises may be meet and agreeable to equity. When it is said that this court, in an equity case on an appeal on questions of both law and fact, in effect reviews the case de novo on the record, the statement necessarily carries with it the assumption that the case has been finally disposed of in the court below, and that that court has made findings which in its judgment were called for by the pleadings and the evidence, and which are essential to a judgment. When that is done, we of course may review the record and approve, reject, or modify, on direct findings as in our judgment the record requires. But that does not mean that we are required to assume the function of determining for the first time the truth or falsity of all of the material and controverted allegations to support a judgment. To hold we are is in effect to make the trial court a mere referee to receive the evidence and certify it up to us without findings.
Thus, on the merits, no findings of fact are found to support the conclusion that the transfers in 1917 were made either in contemplation of death or not to take effect until at or after the death of the deceased. However, since the case is one in equity and since our judgment as to the facts as well as the law applicable thereto is invoked, we have reached the conclusion to review the record for such purpose.
Without any substantial conflict in the evidence, or at least by the clear and manifest weight of it, it is shown that, when the gifts were made, Ezra Thompson, then 66 years of age, was, and prior thereto had been, in vigorous and robust health, and was actively engaged in carrying on and conducting important business affairs, and so continued in good health both in mind and body and actively to be engaged until a month or two before his death, which occurred about 6 years thereafter. The trial court in effect so found. He left surviving him as his sole heirs at law his widow, Emily P. Thompson, three sons, Lynn H., Ezra *Page 37 
P., and Clyde R. Thompson, and Norrine T. Brown, his daughter. Under the American Tables of Mortality, Ezra Thompson, when the gifts were made, had a life expectancy of 10 or 11 years. About a month prior to the making of the gifts, the Thompson-Murdock Investment Company and the Ezra Thompson Investment Company, corporations, were organized. Prior to such organizations Ezra Thompson and James D. Murdock were, and for a number of years prior thereto had been, associated together in a sort of a partnership arrangement in mining, real estate business, and in dealing in mining and other stocks. Each had acquired and possessed a considerable fortune. Both, especially Ezra Thompson, were actively engaged in carrying on and conducting the business. They were large holders of the capital stock of the Cardiff Mining Milling Company with which they were actively connected. In 1915 Lynn H. Thompson, the eldest son of Ezra Thompson, returned from college, and thereafter assisted in the management of his father's business interests and affairs. For sufficient reasons appearing to all parties concerned it was thought that the business could be carried on through corporations. So the Thompson-Murdock Company was organized March 17, 1917, by Ezra Thompson, James D. Murdock, Wm. W. Murdock, and Lynn H. Thompson, and Norrine T. Brown, with an authorized capital stock of $100,000, divided into 1,000 shares, of the par value of $100 each, of which Ezra Thompson subscribed 498 shares, Lynn H. Thompson and Norrine T. Brown one share each, and the balance 500 shares by James D. and Wm. W. Murdock. The capital stock was fully paid for by conveyances to the corporation of real estate by Ezra Thompson and James D. Murdock and their wives. Ezra Thompson became and was the president and a director of the company, Lynn H. Thompson vice president and a director, James D. Murdock secretary and a director, and Wm. W. Murdock treasurer and a director. Ezra Thompson continued to be president and a director thereof until his death. On March 31, 1917, Ezra Thompson and *Page 38 
his wife, Lynn H. Thompson and Dorothy Z. Thompson, his wife, Norrine T. Brown and H. Ross Brown, organized the Ezra Thompson Investment Company with an authorized capital of $100,000, divided into 1,000 shares, of the par value of $100 each, of which Ezra Thompson subscribed 995 shares and the other incorporators one share each. The capital stock was fully paid for by conveyances to the corporation by Ezra Thompson and his wife of real estate in Salt Lake City and in Park City owned and possessed by Ezra Thompson, including his residence in Salt Lake City, and 500 shares of the capital stock of the National Bank of the Republic. The officers of this corporation consisted of Ezra Thompson, president and director, Lynn H. Thompson, vice president, secretary, treasurer, and a director, and Norrine T. Brown a director. In 1920 the articles of incorporation were amended, increasing the board of directors to five members, at which time Ezra P. and Clyde R. Thompson were elected members of the board. On April 17 and 19, 1917, Ezra Thompson, by way of gift to his children, and without consideration other than love and affection and a desire to help them and give them an experience in, and familiarity with, the business, assigned, transferred and delivered to each of them 123 shares of the capital stock of the Thompson-Murdock Investment Company and 249 shares of the Thompson Investment Company, retaining unto himself 4 shares of the capital stock of the Thompson-Murdock Company and one share of the Ezra Thompson Company. At about the same time he, being the owner of a large number of shares of the Cardiff Mining Milling Company, also assigned, transferred, and deliver to each of his children, except Lynn, 50,000 shares of such mining company; he, theretofore, and in June, 1911, having assigned, transferred, and delivered to his son Lynn 78,694 shares of such company. After such transfers in 1917, Ezra Thompson still retained and owned 33,000 shares of the capital stock of the Cardiff Mining Milling Company, and was the owner of other stocks and property in the aggregate *Page 39 
of about $250,000, which during his lifetime were owned, possessed, and disposed of for his own use and benefit, as he saw fit, and of which no complaint is made.
When the transfers were made in 1917, Lynn H. Thompson was 29 years of age, and was, and continued to be, not only vice president, secretary, and treasurer and a director of the Ezra Thompson Investment Company, but also vice president and a director of the Thompson-Murdock Company of which the Murdocks owned and possessed one-half of the capital stock, and also was a director of the Cardiff Mining Milling Company since 1911, when he acquired an interst therein. That he as a director and officer took an active part in the affairs and management of these companies and prior thereto in his father's business, from 1915 until the death of his father, and was paid a reasonable salary for his services, and was a capable young business man, and devoted substantially all of his time in assisting in the management of such corporations, is not disputed. Norrine T. Brown at the time of such transfers was married, and was 26 years of age. In 1920, she was elected assistant secretary of the Thompson Investment Company, and received a reasonable salary for such services. Ezra P. Thompson was 19 years of age. He returned from college in June, 1917, and became a director and assistant manager of the Thompson Investment Company in November, 1920, and received a salary of from $60 to $100 per month, and in 1918 was made superintendent of transportation for the Cardiff Mining and Milling Company, and received a salary of from $175 to $250 per month. In June, 1923, he became assistant manager of the Thompson-Murdock Company. Substantially all of his time was devoted to the interests of such companies. Clyde R. Thompson was only 17 years of age. After its oranization, he served as a collector for the Thompson Investment Company, and also assisted in the transportation of the Cardiff Mining Company, receiving reasonable compensation therefor, and, after November, 1920, became a director of the Thompson Investment Company. That the *Page 40 
transferees after the transfers, especially the sons of the deceased, engaged and participated in the business affairs of the respective companies, is clearly shown.
After the transfer of the stocks to his children, Ezra Thompson until his death continued to be the president and general manager of the Ezra Thompson Investment Company, and received a salary of about $300 per month, and continued to be the president of the Cardiff Mining Milling Company, and received a salary from that company of about $3,000 per anum, and in virtue of such offices took an active part in carrying on and conducting the business affairs of such companies until shortly before his death. He also continued to be the president of a coal company and received a salary also from that company for his services.
Inasmuch as Ezra Thompson and his wife continued to reside in and occupy the residence after the conveyance of it by them to the Thompson Investment Company, such fact is pointed to as a circumstance inconsistent with good faith of the transactions. But the record is clear that after such conveyance Ezra Thompson was charged with a reasonable rent for the use and occupancy of such premises which was deducted from the salary paid him by the Thompson Investment Company. That the salary paid him and that the amount of rent charged to him were reasonable is not questioned, and in no particular is it claimed that he, after the conveyance, exercised, or had any right to exercise, any control or dominion over such porperty. Nor is it claimed that such property at his death was his property or a part of his estate. Nor is it claimed by the state that such conveyance was made in contemplation of death or not to take effect until at his death. Nor is it claimed or found that any of the property transferred and conveyed by Ezra Thompson to either the Thompson-Murdock Company or the Thompson Investment Company was subject to an inheritance tax. What is claimed and found by the court — as mere conclusions — is that the shares of the capital stock of the Thompson Investment Company, *Page 41 
the Thompson-Murdock Company, and the Cardiff Mining Milling Company, transferred by Ezra Thompson to his children in 1917, were transferred in contemplation of death, and to take effect at the death of Ezra Thompson, and hence that such stocks so transferred were subject to the inheritance tax. In other words, the bona fides of the organization of the Thompson Investment Company and of the Thompson-Murdock Company, and the conveyances of the real estate by Ezra Thompson and his wife in payment of the capital stock of such companies, are not questioned, nor is it questioned that such conveyances to either of such companies were not absolute in fee-simple title and in praesenti. No claim is made that the Thompson-Murdock Company or the Thompson Investment Company, and of course not the Cardiff Mining Company, were organized as mere vehicles or instrumentalities by and through which Ezra Thompson handled, or intended to handle, his real estate and other holdings by him conveyed to such companies to prevent the state from collecting an inheritance tax on such properties or holdings, or that such organizations were effected for purposes other than for legitimate or bona fide purposes; and not anything to the contrary was found by the court nor is shown by the evidence.
Thus the question in the case is not the circumstances of the conveyance of real estate, including the residence, to the companies, but were the stocks of these respective companies transferred by Ezra Thompson to the transferees in contemplation of death or not to take effect until at his death. It is only the value of such shares of stock which the state seeks to tax and which the court adjudged was subject to the tax. That the stocks were transferred and delivered to the transferees and were held and possessed by them, and that they remained in their possession from such delivery until the death of the deceased, is not disputed. But it in effect is argued that, after such transfers, Ezra Thompson continued to manage and conduct the business of such corporations, and to dominate their affairs in the *Page 42 
same manner as he had done before such transfers were made; that he thereafter received the dividends of the stocks transferred and the profits of the corporations; that the stocks were held by the transferees, not as real owners, but merely for the use and benefit of Ezra Thompson; and that, while such transferees were in name made officers of such corporations, yet in reality were mere nominal or "dummy" officers thereof. But none of such matters were alleged or found by the trial court, except as heretofore shown as mere conclusions in the language of the statute that "such transfers were made in contemplation of death and to take effect at the death of Ezra Thompson." Since the bona fides and the legitimate existence of the Thompson-Murdock Company and the Ezra Thompson Investment Company are not questioned, we think it of no more controlling importance that Ezra Thompson, after the transfers were made, remained and continued to be the president and manager of such companies, and as such took an active part in the management thereof, than his continuance as president of the Cardiff Mining Milling Company and taking an active part in the management and control of that company, or than if another had been put in as president or manager of such companies. No doubt the transferees thought, and in effect so testified, that their father was more competent than another to manage the affairs of such companies, and thus continued with his services and paid him a reasonable compensation therefor. It was natural, not unreasonable or suspicious, that the transferees, in the management of the companies and the affairs connected therewith, should desire and have the benefit and advice of their father, who, admittedly, was an experienced and capable business man in such affairs and enterprises. All the transferees testified, and their testimony is not disputed by any one nor by any circumstances, that they had the undoubted right at any time to dispense with their father's services and to employ or select another whenever they saw fit. *Page 43 
That the deceased, after the transfers, continued in the management of the companies does not justify the inference that the shares of stock, notwithstanding the transfers, continued to be his property, or that the transfers were not to take effect until his death. In re Romney's Estate, 60 Utah 173, 207 P. 139. There Romney organized a corporation and conveyed real estate and other property to it in payment of the capital stock, and thereafter transferred practically all of the stock to his children. He thereafter continued to look after the business of the company and to control and manage its affairs. As to that this court said:
"The deceased was a man of recognized business ability. He had given to this corporation all the property it possessed. Its stockholders were his children and heirs. In view of these matters it was only natural that the stockholders should repose absolute confidence in his management of the affairs of the corporation, and under these circumstances the control of the corporation by the deceased can be given no serious consideration in the determination of the questions presented by this record."
The court further observed that the title to the property so conveyed remained continually in the name of the corporation, and passed from the control of the deceased. And, on a review of the record, the court in substance held that organizing the company by the deceased and conveying property to it, constituting all the property possessed by it, and giving his children practically all of the capital stock of the company, did not justify a finding that such transfers were made in contemplation of death.
Here the transferees testified that the shares of stock were issued and delivered to them as the absolute and complete owners thereof, without any reservation or restriction whatever, and on the books of the companies were canceled and new certificates issued in the names of the respective transferees in lieu thereof, which at all times were held, possessed, and controlled by them as they saw fit and as the sole owners thereof. The records of the companies show *Page 44 
they attended stockholders' and board meetings, and participated therein, and they testified they voted and acted as they saw fit, without any restraint by their father.
The testimony of the widow, a witness called by the state, is pointed to by respondents also as reflecting on the bona fides of the transactions. She testified that she, without consideration, joined in the deeds of conveyance conveying the real estate owned by her husband, including their residence, to the corporations referred to, and that by doing so knew that she had parted with all interest she had in and to such properties; that she joined in such conveyances because she wanted to do so, and felt confident she would be taken care of by her husband, and that he had salaries and sufficient other property with which to do so, and that she felt just as secure after joining in such conveyances as before, and that she had no discussion with her husband or the children as to the object or purpose of the organization of the companies. We do not see anything unnatural or unreasonable, as is contended, in the wife joining in the conveyances under the conditions stated, nor anything suspicious about it. It is not uncommon for a wife, without consideration, to join in conveyances of real estate owned and possessed by her husband, or without an allowance being made to her in lieu thereof. Since, as already observed, the bona fides of the organization of the companies are not questioned, nor the conveyances made to either of them, and it not being claimed or found that any of the conveyances to either of the corporations was made in contemplation of death, or not to take effect until the death of the grantors or either of them, or that the property so conveyed was not for a valuable consideration, or did not become the property of the corporations in fee simple, and the state not seeking to tax any of the properties so conveyed to such corporations or either of them, the question of whether Mrs. Thompson did or did not join in such conveyances without consideration and the circumstances thereof are of her concern, and not of the state. *Page 45 
The testimony of Mrs. Brown is also referred to. She testified that she became the unqualified and sole owner and possessor of the stock transferred to her, and that her father, after the transfer, had no control or dominion over it; that she attended stockholders' and board meetings, and voted the stock and participated in such meetings as she saw fit and without any restriction or direction of her father; that she was unfamiliar with the details of the business, and had not taken an active part therein, and, when first questioned about it, did not accurately recall the number or amount of dividends paid by the respective companies and received by her, and in other particulars was unfamiliar with the business carried on and conducted by the companies. She further testified that, when the corporations were organized, her father was active in the management of them and of the corporate affairs, and that he, after the transfer of the stocks, continued active in such management, but was not the sole manager of such companies; that the companies were managed as corporations generally are managed, through boards of directors and officers, and that, whenever real estate of the companies was purchased or sold, such sales or purchases were made by and with the advice and consent of the company. So, too, one of her younger brothers, when his attention was first called to the matter, did not accurately recall the amount of dividends paid and received by him from the respective companies. He had not engaged in the business affairs of the companies as actively as his brothers. But that Lynn, from the very start, and until after the death of his father, was actively engaged in the business affairs of the corporations, and devoted substantially all of his time thereto, and as later also did one of his brothers, is not disputed. That Mrs. Brown or other transferees were not as familiar with the condition of the corporations as those who were more actively engaged therein in no manner tends to reflect upon their bona fides as stockholders.
After the transfers, two dividends, in 1917, or in 1917 *Page 46 
and 1918, were declared and paid by the Thompson Investment Company. Both dividends amounted to $6.40 per share. The amount paid to and received by each of the transferees of stock in that company amounted to $1,587. Two dividends were declared and paid by the Thompson-Murdock Company. Both dividends amounted to $25 per share. The amount of such dividends paid and received by each of the transferees of stock of that company amounted to $3,100. Between 1917 and 1920 the Cardiff Mining Milling Company declared and paid four dividends. The amount of dividends paid to and received by Norrine T. Brown from such company on the stock transferred to her was a total of $37,500; Ezra P. Thompson, $39,100; Lynn H., $38,037; and Clyde R., $20,300, two dividends aggregating $17,500 having been paid to Clyde's mother for and during a period in which Clyde had transferred his stock to her. In 1917 each of the transferees loaned the amount of dividends received by them to their father. In 1918 Lynn H. and Ezra P. Thompson loaned the amount they received to their father and Norrine Brown the amount she received to the Thompson Investment Company. In 1919 all of the transferees, except Clyde, loaned the amounts received by them to the Thompson Investment Company, and in 1920 all loaned the dividends received by them to the Thompson Investment Company. All of such loans were made at 6 per cent interest. Ezra Thompson gave promissory notes for the loans made to him and the Thompson Investment Company for loans made to it. All loans made to Ezra Thompson were repaid by him in 1920. No other dividends were paid until 1923, but the dividends paid that year and those paid subsequent to the death of Ezra Thompson to the transferees were by them loaned to the Thompson Investment Company. That the dividends were paid to and received by the transferees is clearly shown. The transferees so testified, and we do not find any evidence in the record to dispute such testimony. Such dividends were paid by checks of the respective companies payable to the respective *Page 47 
transferees, and which bear their indorsements. That Ezra Thompson gave his notes to the transferees for the loans made to him also is clearly shown. The principal point made in respect thereof is the manner in which he repaid the loans. It was shown that prior to 1920 the Thompson-Murdock Company had become indebted to Ezra Thompson in an amount largely in excess of the amount of moneys loaned to him by his children and to the Thompson Investment Company. There is no dispute as to that. In November, 1920, Norrine T. Brown, Lynn H., Ezra P., and Clyde H. Thompson, as individual creditors of Ezra Thompson, and as directors of the Ezra Thompson Investment Company, agreed that the obligations of Ezra Thompson to them should be assumed by the Thompson Investment Company in consideration of an assignment to such company by Ezra Thompson of an equal amount of the obligation of the Thompson-Murdock Investment Company to him, and in such manner Ezra Thompson paid and satisfied his obligations to his children in full, whereupon the notes evidencing such obligations were canceled and surrendered. Thus, because of the moneys so received by the transferees as dividends and loaned to Ezra Thompson, and the manner in which such loans were paid, the contention is made that the moneys paid as dividends belonged to Thompson, and that the loans were mere pretenses.
Though it be assumed that the transaction is one requiring scrutiny, yet, when fully scrutinized, it clearly is made to appear, not only by testimony, but by the books and records of the respective companies, that the transferees in fact received the dividends on the shares of stock held by them, and loaned the amounts received to Thompson and to the Thompson Investment Company. And, it being clearly shown that the Thompson-Murdock Company was in fact indebted to Ezra Thompson, and the transferees as the individual creditors of Thompson willing to take the Thompson Investment Company as their debtor, and that company willing to assume the obligations, the transactions were of *Page 48 
no concern to any one except those interested therein. If the stocks transferred to the transferees were in fact owned and possessed by them, as is clearly shown by the record, they were entitled to the dividends paid thereon, and hence it was no concern to the state what they did with the moneys so received by them, whether they loaned them to their father or to some one else, or otherwise invested them, and was of no concern to the state on this inquiry whether Thompson had or had not repaid such moneys.
It is so clearly shown by the evidence that the stocks in fact were transferred and delivered to the tranferees as the sole owners thereof, taking effect in praesenti without any restrictions or qualifications whatsoever; that on the books of the respective companies the certificates of shares transferred were canceled and new certificates issued in lieu thereof to the respective transferees, and that they had the sole control and dominion over them; that the transferees attended stockholders' and board meetings, voted their stock, and participated in such meetings as they saw fit and that the dividends were paid to and received by them as the absolute owners and holders thereof; that, had the court found to the contrary, such findings would be not only against the clear and manifest weight of the evidence, but would have no substantial support by the evidence. However, it is contended that Thompson transferring the stocks to his children, they receiving the dividends, but loaning them back to their father, and his giving notes as and for the loans, and repaying them in manner as shown, and that all of the transactions and dealings between them, were things done only in form and not in reality, and thus were not what they seem or purport to be, but were mere devices to avoid the payment of an inheritance tax on such property. If in the absence of evidence to the contrary, things are not to be taken or regarded what they fairly seem or purport to be, then indeed the chimerical may assert the Great American Desert is the most fertile spot on earth and Death Valley a paradise. *Page 49 
We have thus in some detail referred to the evidence to show that the transfers of all the shares of stock were complete and absolute gifts to take effect in praesenti, and not until at the death of the deceased, and that not 12, 13 anything is made to appear to justify the conclusion that any of the gifts or transfers were made in contemplation of death; that not anything is made to appear that Ezra Thompson, 66 years of age, in good physical and mental health, and actively engaged in business, had any apprehension or expectation of death in the near future. Nor was there any existing condition or circumstance whatever shown to create a fear or apprehension that death was near or to be expected in the near future, nor any condition or circumstance tending to prompt a person to dispose of his property in expectation of death in the near future. Not anything is made to appear that Ezra Thompson expressed or manifested either by words or conduct any expectation or apprehension of death, or because of any expectation or apprehension of death transferred the stock. The burden, of course, was on the state to show that these transfers were made in contemplation of death or not to take effect until at the death of the donor. The state not only failed to sustain the burden, but failed to adduce any evidence to support the allegations.
It, however, in effect is argued that, though the gifts were made in praesenti, and irrevocably to operate in the lifetime of the deceased, though no other act of the parties and no contingency of death or otherwise was needed to give the gifts effect, and though the donor thereby completely and irrevocably divested himself of title and transmitted it to the donees, yet, since the donor, though 6 years before his death, in good physical and mental health, and in fact without apprehension or expectation that death was near, by way of gifts without consideration other than of blood and love and affection, transferred and parted with the greater part of his wealth or holdings to those who were the natural objects of his bounty, the law and the *Page 50 
statute will regard such disposition as of testamentary character, and thus as having been made in contemplation of death within the meaning of the statute, and the property donated subject to the tax, if the value thereof exceeded $10,000 over and above the debts of the donor at the time of his death; and this, too, regardless of the time or of other circumstances or conditions at or under which the gifts were made.
The authorities generally agree that whether a conveyance or transfer is made in contemplation of death is largely a question of fact, dependent upon the particular facts and circumstances of each case. Whether a given state of facts is sufficient to support a conclusion that the transfer was made in 14, 15 contemplation of death is a question of law, and dependent upon the meaning to be given the words "in contemplation of the death" as used in the statute. In such respect must be noted the distinction, as already pointed out, between the 1917 statute and the 1919 statute. As a general rule, words of a statute are to be construed in their ordinary sense, and a meaning given them commonly attributed to them. Ordinarily, the word "contemplate" means to ponder, to study, to plan, to meditate, to reflect, to consider with continued attention. The great weight of authority is, and as stated by Ross in his work on Inheritance Taxation, § 117, that the obvious meaning of the words or phrase "in contemplation of death" is to cover the transfers of persons who were prompted to act by reason of theexpectation of death, and who thereby accomplish transmissions of property in the nature of testamentary dispositions; that the words do not refer to that general expectation commonly entertained by all persons, but rather to that apprehension which arises from some existing condition of body or some impending peril; that they refer to an expectation of death which arises from such a bodily or mental condition as prompts persons to dispose of their property and bestow it on those whom they regard *Page 51 
as entitled to their bounty; that the contemplation of death must be the impelling motive, without which the conveyance would not have been made, in order to subject the transferred property to the inheritance tax; that an owner may give away or otherwise dispose of his property or any part of it in any manner he sees fit, and, if such disposition takes effect in possession and enjoyment during his lifetime, it will not be taxable, unless made in contemplation of death, as indicated.
The Kentucky court well defined the phrase in Commonwealth
v. Fenley, 189 Ky. 480, 225 S.W. 154. That court there said:
"The anticipation or apprehension of death in the ordinary and natural course of events is not such contemplation of death as the statute has in view. The contemplation of death the statute speaks of is a present apprehension of death arising from some existing condition or impending peril that would reasonably create a fear that death was near at hand, as, for example, when the grantor is in bad health and the compelling thought of death is prominent in his mind, or when he is in the presence of or there is fear or apprehension of some danger or peril that might reasonably and naturally produce an expectation of death."
The proposition is well put in the case of Meyer v. UnitedStates, 60 Ct. Cl. 474, 5 Am. Fed. Tax Rep. 5400, as follows:
"A review of the authorities is scarcely necessary to sustain the proposition that the contemplation of death referred to in the statute is not that contemplation of death which must be present with all of us, mindful of its certainty at some time, we know not when, but it is that state of mind which by reason of advanced age, serious illness, or other producing cause induces the conviction that death in the near future is to be anticipated. If it be said that there need not be a conviction that death is imminent, there must at least be a belief that it is to be expected in the very near future rather than in the usual course of events; and in this state of mind, in this belief in the near approach of death, must be found the motive for the conveyance if it is properly to be characterized as made in contemplation of death." *Page 52 
In Rea v. Hiner (D.C.) 6 F.2d 389, the court, after reviewing and considering the cases upon the subject, observed:
"These principles have been applied with great uniformity in the adjudicated cases, both in the state and federal courts. There is a common agreement that the words `contemplation of death' mean not the general knowledge of all men that they must die; that it must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand; and that, so arising, it must be the direct and animating cause, and the only cause, of the transfer. If this apprehension, so arising, is absent, there is not that contemplation of death intended by the statute, especially when another adequate motive actuating the gift is shown."
Many cases are there cited and referred to.
In People v. Carpenter, 264 Ill. 400, 106 N.E. 302, it is said:
"Of course, the words `in contemplation of death,' * * * do not mean that general expectation of all rational mortals that they will die some time, but it means an apprehension of death which arises from some existing infirmity or impending peril."
In People v. Danks, 289 Ill. 542, 124 N.E. 625, 7 A.L.R. 1023, the same court again said:
"A gift is made `in contemplation of death' when it is made in expectation of that event, or with that event in view. (Rosenthal v. People [211 Ill. 306, 71 N.E. 1121], supra.) The term does not mean that general expectation which all rational persons have that they must die some time, but refers more particularly to that apprehension of death which arises from some existing infirmity of such a character as would prompt an ordinarily prudent person to make a disposition of his property and bestow it upon those whom he regarded as most entitled to be the recipients of his bounty."
In Spreckels v. State, 30 Cal.App. 363, 158 P. 549, the California court said:
"First, it will be well to inquire into the legislative meaning and scope of the language `in contemplation of death,' as that phrase is *Page 53 
used in the statute. It certainly cannot justly be held that the purpose or the intention of the Legislature was, by the law in question, to subject every transfer of property by gift to the burden of the inheritance tax. Obviously (in other words) the language referred to was not intended to include that general expectation of death which is the essential concomitant of the inherent knowledge of the inevitable termination of all life, and which is in the young and the physically robust as well as in the aged and the infirm. No similar statute has been so construed. A reasonable and just view of the law in question is that it is only where the transfer of property by gift is immediately and directly prompted by the expectation of death that the property so transfered becomes amenable to the burden; or, as counsel for the respondents with singular aptness states the proposition: `It is only when contemplation of death is the motive without which the conveyance would not be made that a transfer may be subjected to the tax.' That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer,"
— and approved the rule as stated in Ross on Inheritance Taxation, supra. The California statute then was similar to ours.
In Conway's Estate v. State, 72 Ind. App. 303,120 N.E. 717, the Indiana court said:
"The words `in contemplation of death' as used in inheritance tax statutes, do not refer to that general expectation of death entertained by all persons; but they do refer to that expectation of death which arises from such bodily or mental conditions, irrespective of the cause in any particular case, which prompts persons to dispose of their property to those they deem entitled to their bounty."
To the same effect also are the following among many other cases: State v. Thompson (In re Dessert's Estate),154 Wis. 320, 142 N.W. 647, 46 L.R.A. (N.S.) 790, Ann. Cas. 1915B, 1084;Rosenthal v. People, 211 Ill. 206, 71 N.E. 1121; People v.Forman, 322 Ill. 223, 153 N.E. 376; Kueter's Estate, 45 S.D. 341,187 N.W. 625, 21 A.L.R. 1330; State v. Pabst,139 Wis. 561, 121 N.W. 351; Shwab v. Doyle (C.C.A.) 269 F. 321; and In re Baker's Estate, 83 A.D. 530, 82 N.Y.S. 390. To such effect, too, is *Page 54 
the undoubted holding of this court in In re Romney's Estate, supra. And such is the undoubted great weight of authority as to the meaning of the phrase "in contemplation of the death" under statutes similar to ours, and where the phrase is not defined by statute as it is not by our 1917 statute, the statute under which the tax here must be determined. We have not been referred to any case where, under a similar statute, a different meaning was given the phrase than as above indicated. As stated in the Spreckels Case, no similar statute has been otherwise construed. When our inheritance tax statute was adopted, such was the construction which all of the courts, as far as we have been advised, had given the phrase. It may well be presumed that, when the statute was adopted, the Legislature used the phrase in no other or different sense.
However, cases from California, Estate of Reynolds, 169 Cal. 600,147 P. 268; In re Pauson's Estate, 186 Cal. 358,199 P. 331, and Chambers v. Larronde, 196 Cal. 100, 235 P. 1024, 41 A.L.R. 980, decided since the Spreckels Case, are cited as authority, giving a different and an enlarged meaning to the phrase "in contemplation of the death" than was given in the Spreckels Case and by the courts generally. As heretofore observed, the California statute, the statute of 1905 (page 341), when the Spreckels Case was decided, was similar to our statute. After its amendment in 1911 (page 713), the California statute, among other things, provided that the words "in contemplation of the death" as used in the act included "that expectancy of death which actuates the mind of a person upon the execution of his will," and "it is hereby declared to be the intent and purpose of this act to tax any and all transfers which are made in lieu of or to avoid the passing of the property transferred by testate or intestate laws," elements not contained in the 1905 statute and not contained in our statute.
It is claimed that the legal effect of the California statute after the amendment is the same as it was before the amendment, *Page 55 
and hence whatever construction or interpretation the California courts have given their amended statute should now be given our statute. True, the case of Estate of Reynolds, supra, contains language in substance stating that the legal effect of the California statute after its amendment was the same as it was before the amendment. But in the later case (In re Pauson's Estate, supra) the same court held that what was said in the Reynolds Case concerning the construction or interpretation of the California statute after its amendment was obiter dictum, and that the case "is no authority as to the interpretation of the law of 1911." The Reynolds Case is there reviewed, and on its facts shown to be one where the gifts and transfers were made in contemplation of death as such words are construed and interpreted by courts generally under similar statutes before the amendment. In the Reynolds Case the decedent was afflicted with a sarcoma, a malignant tumerous growth in the hip. He had undergone numerous operations in an attempt to eradicate the tumor, the last three before the final operation occurring 3 months apart. The deceased was advised of the serious character of the sarcoma, knew the danger of its recurrence, and, if not successfully eradicated, that it meant death. About a year before his death it was deemed necessary to perform "one last grave operation," the amputation of his leg at the hip, which was deemed necessary to save his life. Two days before this final operation he made gifts and transfers of valuable property to his wife. Several months after the operation he made other gifts to his wife and son, at which time he knew that the tumor had returned, and that the days of his life were numbered. About a year after the last operation, and about 5 months after the last gifts were made, the deceased died of the sarcoma. That the evidence in such case was sufficient — almost beyond controversy — to justify a finding that the gifts and transfers were made in contemplation of death, as defined and interpreted by the courts generally may not well be doubted. *Page 56 
Recurring, now, to the Pauson Case: A reading of it shows that the court there in effect held that the amended statute was broader than the statute before the amendment. After referring to the history of the inheritance tax law of California and the numerous statutory amendments there had, the court said:
"Some of these amendments have been thereafter shown to be unnecessary, and, as stated in Estate of Reynolds, supra, merely declaratory of the law as it already existed. Others have extended the law to cases not originally included. We think the change in the inheritance law of 1911 was of the latter character."
We think such conclusion inevitable by a mere comparison of the California statute before the amendment with the statute after the amendment. And the opinion in the Pauson Case shows the holding to be that the law was so extended as to include any and all transfers made in lieu of or to avoid the passing of property transferred by testate or intestate laws and to include that expectancy of death which actuates the mind of a person upon the execution of a will. Admittedly these elements are not expressly contained in, or declared by, our statute; and we see no warrant to read them into it. Though the courts of California had held that the legal effect of their statute after the amendment was the same as and included no more than did the statute before the amendment, such a holding, we think, would not be justified by, and would be inconsistent with, the language of the two statutes, and would be a holding in direct conflict with the numerous holdings of courts considering and interpreting statutes similar to the California statute before the amendment. And, if it be true that the California statute after the amendment in legal effect is the same as, and includes no more than did, the statute before the amendment, then the latter statute requires the same construction or interpretation as the former and as was given it by that court in the Spreckels Case and in harmony with the undoubted weight of authority. In other *Page 57 
words, why contend that the two statutes in legal effect are the same, and then give the latter an interpretation with an enlarged meaning not given the former, and which the courts generally hold may not be given it?
However, in Chambers v. Larronde, supra, the California court declared that it now adopted the dictum declared in the Reynolds Case. The court conceded that the law in force, the 1905 statute, at the time the transfers were made, and not the statute after the amendment determined the question of taxability, citing Estate of Brix, 181 Cal. 667, 186 P. 135. The court further said that the dictum in the Reynolds Case was not criticized in the Pauson Case. A reading of the Pauson Case shows that the dictum was not only criticized, but was repudiated. In the Chambers Case the court said that the 1905 and the 1911 acts were intended "to cover identical cases." In the Pauson Case the court said not. No reasons are given in the Chambers Case why the two statutes are the same. It is merely so declared. The court further said that:
"It may be argued that, as the act of 1905 did not contain a definition of the phrase, the amendment of 1911 would be unnecessary and superfluous if our conclusion is correct. But this was a matter entirely resting in the discretion of the Legislature, for what an enactment shall contain presents a legislative and not a judicial question."
Let it be conceded that it is within the power of the Legislature to define the phrase, yet that does not answer the question, if the two acts are the same and "cover identical cases" of the necessity or purpose of the amendment. May not the better answer be that the act of 1905, as construed by the Spreckels Case and other California cases, did not cover all the cases which the Legislature thought ought to be subject to the tax, and hence, by the amendment of 1911, included elements or added cases not contained in the 1905 statute, and, as was held in the Pauson Case, was done by the amendment of 1911? Giving the 1905 statute the same *Page 58 
meaning and construction as the 1911 statute is not only in conflict with the Spreckels Case and the Pauson Case, but also in conflict with about all of the state courts and of the federal courts of the country construing statutes similar to the 1905 statute. Thus, in construing our statute, the question is whether as a precedent the Chambers Case should be followed or the great weight of authority as shown by numerous other state courts and by the federal courts. We have no hesitancy in following the latter. And we say here, with what is said in Shwab v. Doyle, supra, that "the California decisions are not specially pertinent, for the reason that the California statute contains a definition of the term `in contemplation of death.'"
The case of In re Bottomley's Estate, 92 N.J. Equity 202,111 A. 605, also is referred to as supporting views similar to those in the Chambers Case. In that case the deceased, in 1918, then more than 70 years of age, and who some years prior thereto had suffered a stroke of apoplexy, transferred to his son stocks of considerable value, constituting 70 or 75 per cent of his property, and on which he had received annual dividends of more than $15,000, with the express agreement that the son, during the lifetime of the deceased, was to pay him an annuity of $15,000. The deceased died in 1919, a little more than a year after the gift and transfer. Contemporaneous with the transfer, he also made a gift and transfer to his wife, and also made a will disposing of the rest of his property in which the gift to his wife was characterized in lieu of testamentary disposition. In view thereof, the conclusion was reached that the gift to his son was also of the same character. Said the court: The gift was made when the donor "had passed the scriptural mark of three score years and ten, and, therefore, when his `contemplation' of death was that of an event not on the horizon of life but in its foreground, and, perhaps, very near; he had had the prior apoplectic stroke which, despite his recovery, had left its effects. It was made contemporaneously with a gift to his wife which he, in effect, *Page 59 
characterizes in his will as a gift in lieu of testamentary disposition. Finally, he makes the gift only upon the son's promise to pay to him for the rest of his life the same amount of money that he would have derived from the subject-matter of the gift. By so doing he had, as a practical matter, provided that the making of the transfer should have no effect upon his own income or mode of living until his death."
If it be assumed that the conclusion there reached on the stated facts is correct, yet, as we perceive, the material factors upon which the conclusion is based are here not present. The only chief factor in common is that the deceased disposed of a material or greater part of his estate to his children. But the conditions and circumstances of the disposal are dissimilar. There, because the donee agreed to pay the donor during his life an annuity in a sum equivalent to the prior annual paid dividends on the stock, the transfer was regarded as not to take effect until the death of the donor. That the transfers were here to take, and did take, effect immediately cannot well be doubted. There, because a will was made contemporaneous with the gifts, and one of them therein characterized as in lieu of testamentary disposition, the other was also so regarded. Here, as has been seen, no such element is present. There, because of the physical condition and age of the donor, his death was not on but in the foreground of the horizon of life, "and perhaps very near." Such was not the situation here, unless it can be said that one 66 year of age, without any ailment or infirmity whatever, in vigorous and robust health, and actively engaged in business affairs, is in such "foreground." As to that the case of In reDessert's Estate, supra, is pertinent. There the donor, 86 years of age, 3 or 4 years prior to his death, by way of gifts, gave his daughter and her husband cash, stocks, and securities amounting to $493,423, which constituted more than two-thirds of his estate. The gifts were in accordance with a will made by the donor several years prior to the making of the gifts. The statute *Page 60 
imposed an inheritance tax upon any transfer of property, real, personal, or mixed, when the transfer is by will or by the intestate laws of the state, and when the transfer is of property by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor or donor, or intended to take effect in possession or enjoyment at or after such death. In holding the transfer not subject to the tax, the court among other things said:
"An act is not done in contemplation of death when the feeling that dissolution is approaching is absent and is not the cause which impels or prompts the doing of the act. An aged person in good health who has acquired a competency and who desires to retire from active life may desire to distribute a portion of his accumulations among his children without any thought of impending death. He may derive genuine enjoyment from seeing them enjoy the fruits of his accumulations if they put them to good use, and may take pleasure in giving his advice or counsel as to how the business or property turned over should be managed or handled. The question of whether such a person may have a few years or many years to live is not a consideration that has entered into or affected that transaction. He does not give because he is anticipating death, but because it affords him a pleasure in life. * * * It is only gifts made in contemplation of death that are taxable. A parent has the right to give his property to any proper subject for his bounty, freed from any transfer tax, provided the contemplation of death is not the cause which impels the making of the donation. * * * Common knowledge and experience teach us that aged people frequently give property to their children because of their desire to help them, and without any thought in reference to their own deaths."
The court further observed that the fact a will was made by the donor giving to the daughter, the donee, practically all of his estate, did not argue that the gifts subsequently made "were made `in contemplation of death,' as that term is used in the statute."
It further is argued that Thompson organized or caused the companies to be organized and the shares of stock to be transferred to his children to prevent the collection of an inheritance tax on such property, and that, when 16, 17 a conveyance or transfer is made for such purpose, *Page 61 
the property so transferred is taxable. In the first place, we do not find anything to warrant such a conclusion, except the mere fact that such companies were organized and such transfers made. In the absence of evidence to the contrary, good and not wrong intentions or motives will be be presumed. But, as several times already observed, the bona fides of the organization of the companies and the transfers of property to them are not questioned. And the record without substantial dispute shows that the transfers of stock were made in praesenti by Thompson to his children to help and benefit them, to acquaint and familiarize them with the business, and to take an interest therein and keep the holdings togteher, with no thought, expectation, or belief that death was likely or probable in the near future. In the next place, the question of whether the donor did or did not have any intention to avoid the provisions of the Inheritance Tax Act is immaterial. Shwab v. Doyle, supra; Moore v. Bugbee (N.J. Sup.) 128 A. 679; Kunhardt v. Bugbee (N.J. Sup.) 130 A. 660;Reish v. Commonwealth, 106 Pa. 521. These authorities teach that the pertinent question is, Were the transfers made in contemplation of death or intended not to take effect in enjoyment until the death of the donor? If they were not so made, then whether the donor is making the transfers in praesenti did or did not intend to avoid the Inheritance Tax or to prevent the property transferred from becoming subject to the tax has no pertinency; and that a desire or an intent that an inheritance tax shall not be collected on property transferred is not a contemplation, or in contemplation, of death. To hold that a transfer, made with intent to prevent property transferred from being burdened with an inheritance tax, is subject to taxation, is to extend by construction the literal terms of the statute imposing the tax, which may not be done. Osgood's Estate,52 Utah 185, 173 P. 152, L.R.A. 1918E, 697. Under the statute, so long as the gifts or transfers are absolute and in praesenti, and not in contemplation of death, as heretofore indicated, *Page 62 
the donor has the right to give part or all of his estate or property to charity, or benevolence, or to a mere stranger, or to his children, without such transfers being subject to tax. A donor may be as generous to his children as to a stranger or charity, and, if an absolute gift or transfer in praesenti, made a considerable time prior to the death of the donor, and while in good physical and mental health, to charity or to a stranger of all or the greater part of the donor's property, is not subject to an inheritance tax, then gifts made under similar circumstances to the donor's children in praesenti and to take effect immediately likewise are not subject to the tax. In reDessert's Estate, supra.
Here again must it be noticed that our statute does not say, as does the California statute after its amendment, that all transfers, no matter when made, to avoid the passing of property transferred by testate or intestate laws, are subject to the tax. Until the Legislature shall declare that property transferred with such intent is subject to the tax, we do not feel justified in so holding. And for stronger reasons are we disposed not to do indirectly what we may not do directly by saying that an intent to avoid the tax is a contemplation of death. Just as clear is it that our statute, unlike the California statute after its amendment, does not, by defining the phrase "in contemplation of the death," include an expectancy of death which actuates the mind of a person in the execution of a will. It readily is perceived that some wills may be and are executed under conditions and circumstances where the testator has reason to believe, or does believe, that death is near or impending and in such state of mind, and, because of it, is actuated to make his will. In such case it may well be said that the will was made in contemplation of death. On the other hand, it is just as clear that many wills are made in the absence of, and not under, such conditions, and without any belief, thought, or expectancy that death is likely or probable in the near future, and where the mind of the testator is not actuated or influenced by any thought or expectancy *Page 63 
of death other than the realization common to all that life is uncertain, and that all some time must die. Of course, property devised or bequeathed by will is subject to the tax; but that is so because the possession and enjoyment of it does not take effect and the title thereto does not pass until the death of he testator. The property is still his property and the property of his estate at his death. Here the state does not claim that the shares of stock transferred were, at the death of the deceased, the property of his estate. That, in its brief, is disclaimed.
Thus, upon a review and consideration of the evidence and of our statute as to the meaning of the phrase "in contemplation of the death," as defined practically by all of the courts construing similar statutes, we are of the opinion that 18 the evidence is insufficient to support a finding or conclusion that the transfers here made were made in contemplation of death, and that the state, unaided by presumptions, and having the burden of establishing such fact, wholly failed to do so. Just as clear is it that the state failed to show that the transfers were not to take effect until at or after the death of the deceased, and that the evidence without substantial conflict shows the contrary. Here, as is shown by the evidence, the property, when transferred, passed with all the attributes of ownership and independently of the death of the deceased, and that the transferees had the uncontrolled right or power to possess, enjoy, and dispose of the property as they saw fit, and that the deceased neither reserved nor exercised any control or dominion over the property so transferred. Under such circumstances the authorities are clear that the property is not subject to an inheritance tax on the theory that the transfers were not to take effect until at or after the death of the deceased. Nickel v. State, 43 Nev. 12, 177 P. 409, 185 P. 565; Dexter v. Jackson, 243 Mass. 137 N.E. 877; ReHoneyman's Estate (N.J. Prerog.) 129 A. 393; Re Fulham'sEstate, 96 Vt. 308, *Page 64 119 A. 437; Girard Trust Co. v. McCaughn (D.C.) 3 F.2d 618.
When the shares of stock were transferred, they, by the transferees, were surrendered up, and were canceled, and new certificates in lieu thereof issued to them. 19 That in itself, though not conclusive as between the parties, yet is good evidence of a design to part with the right of property in favor of another and of an absolute transfer of title to him. Roberts Appeal, 85 Pa. 84. In addition to that, all of the transferees, several years prior to the death of the deceased, sold several thousand shares of the capital stock of the Cardiff Mining Milling Company which had been transferred to them by the deceased, and each used the proceeds of sale for his own use. As shown by the evidence, they had the equal right and power to similarly dispose of any of the other shares of stock transferred to them. Several years prior to the death of the deceased, Ezra P. Thompson pledged 45,000 shares of the Cardiff Mining Milling Company stock transferred to him, with Salt Lake brokers as collateral on his account of $46,000 due them on stocks and bonds purchased by him for his own use. Later, and about one year prior to the death of the deceased, Ezra P. Thompson again pledged his stock to a bank on a loan of $35,000 to him and his brother Clyde.
Our conclusions, therefore, are: That the property sought to be taxed is not taxable; that the findings of the trial court should be disapproved and annulled; that the judgment rendered thereon should be reversed and set aside; that the cause should be remanded to the district court, with directions to make findings in accordance with the views herein expressed, and to the effect that the transfers were not made in contemplation of death, or not to take effect until at or after the death of the deceased, to state conclusions that the property sought to be taxed is not taxable, and that the petitioner take nothing by his petition; and to render *Page 65 
and enter judgment on merits accordingly. It is so ordered. Costs to appellants.