In re LAMBOURNE'S ESTATE.

TOBIAS et al. v. STATE TAX COMMISSION.

No. 6071.   Decided August 11, 1939.   (93 P. 2d 475.)

*Irwin Arnovitz* and *Alfred Klein,* both of Salt Lake City, for appellant.

*Ingebretsen, Ray, Rawlins & Christensen,* of Salt Lake City, for respondents.

PRATT, Justice.

What is meant by the phrase "in contemplation of death"? The phrase is found in Section 80-12-4, R. S. U. 1933:

> "Any transfer of a material part of any such property in the nature of a final disposition or distribution thereof made by a decedent within three years prior to his death, except a bona fide sale for a fair consideration in money or moneys worth, shall be presumed to have been made in contemplation of death, for the purposes of this chapter."

We answered the question in 1927. Our answer is found in the case of *In re Thompson's Estate,* 72 Utah 17, 269 P. 103. Since 1927 our legislature has had several sessions. They have not seen fit to modify our interpretation of that phrase. It would seem that such tacit approval of the opin-

ion justifies its retention. At least, an exceptionally good reason should be shown for a change.

The facts of this case we shall discuss later; but of them may we now say: They are not exceptional. They do not present a situation likely to have been beyond ■ the range of probable anticipation at the time of the Thompson decision.

Appellant, the State Tax Commission, says of that decision, this:

"That particular case holds that contemplation of death means apprehension of immediate death through present illness or imminent peril and that a person acting with no other motive than to evade inheritance tax will not necessarily be acting in contemplation of death. We submit that this is a narrow interpretation of contemplation of death which has more or less been enlarged upon by recent definitions. * * *"

They refer to the case of *United States* v. *Wells,* 1931, 283 U. S. 102, 51 S. Ct. 446, 451, 75 L. Ed. 867. The Honorable Chief Justice, Charles Evans Hughes, rendered the decision. Among other things he said:

"* * * Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body and mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. * * * The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer * * *."

Compare that quotation with the following from the prevailing opinion of the Thompson decision [72 Utah 17, 269 P. 115]:

"* * * that the words do not refer to that general expectation commonly entertained by all persons, but rather to that apprehension which arises from some existing condition of body or some impending

peril"—and the learned Justice did not stop here—"that they refer to an expectation of death which arises from such a bodily or mental condition as prompts persons to dispose of their property and bestow it on those whom they regard as entitled to their bounty; that the contemplation of death must be the impelling motive, without which the conveyance would not have been made * * *."

Mr. "X" is neurotic. He is firmly convinced that his indigestion is cancer. He has visions of dying. He conveys his property to his children. We know it is not cancer. But his apprehension is none the less the impelling motive for his act.

Mr. "Y" stepped off the curb into the path of an oncoming automobile. He was not injured, but rather badly shaken up. Cold shivers creep up his spine at the thought of what might have been. In imagination he sees his family alone and trying to save his property. He goes home and conveys his property to them. Does the Thompson decision say the conveyance was not in contemplation of death, because as a matter of fact there was no impending peril? We think not.

Human minds do not react with the mechanical precision and sameness of a robot. What may influence one, may be unimpressive upon another. The apprehension of death in one may be just as strong as that in the other, in spite of the fact that the former reacts to false premises, whereas the latter reacts to a real cause. And such, in our opinion, was the meaning of the references in the Thompson and the Wells cases to a bodily or a *mental* condition that induces one to convey his property.

What about an intention to evade the inheritance tax? Both decisions say that the apprehension of death must be the impelling motive for the transfer. In other words, that apprehension must be the thing without which the transfer would not have been made.

Mr. "Y", when he arrived home, commenced the writing of his will. Suddenly there came to his mind the word of his close friend, the lawyer, that he could save some money

by making a present transfer. But "Y" did not like the idea of losing control of the property. He would be clever, he thought. He transferred with a secret agreement on the side, that it should be for the purpose only of evading the tax. What induced the transfer as distinguished from the will? It was not the apprehension of death, but a desire to defeat the tax law. The apprehension of death impelled him to provide for his family; the desire to defeat the law impelled the form of distribution he selected.

The legislature has not said that from a desire to defeat the law shall arise the presumption that the transferor was apprehensive of death, or was contemplating death, as that phrase has been defined by the decisions. It is not for the courts to recognize as presumed facts those which are not either by custom or by logic inferable from the facts upon which they are supposed to be based.

We see no reason for changing the Thompson decision. Now let us apply it to the facts of this case.

Mr. and Mrs. Lambourne (Alicia Lambourne) were wealthy. They had three grandchildren, Margaret, Virginia, and George. They adopted Margaret and Virginia. George lived with his father. The mother, a daughter of the Lambournes, was dead. Elizabeth Tobias was a sister of Mrs. Lambourne, and confidential secretary to Mr. and Mrs. Lambourne. Oscar N. Friendly was a business associate of Mr. and Mrs. Lambourne and acted as a financial advisor to them. Especially after the death of Mr. Lambourne did he and Mrs. Tobias advise the widow and the two girls.

Mr. Lambourne died August 2, 1935, Mrs. (Alicia) Lambourne died February 22, 1937. Up to a few days before her death, Mrs. Lambourne had been a very active woman. She was 70 years of age. In fact, she had purchased tickets east for herself and sister, when she took cold at a party, from which cold she never recovered. On the date of her death, Margaret was 23 years of age, Virginia 21 years, and George 19 years.

In 1922, Mr. Lambourne created a trust for the benefit of the three children to accumulate for distribution to them in 1943. By 1936 that trust had grown to $600,000 in size. In 1928 the title to the real estate constituting the home of Mr. and Mrs. Lambourne became vested in Margaret and Virginia. The home had an approximate value of $40,000. In 1929, Margaret and Virginia each were given certain German bonds of the par value of $30,000.

Mr. and Mrs. Lambourne kept their holdings together. There was no segregation until after his death. Then Mrs. Tobias attempted a tabulation, segregating them. Between February 19, 1934 and May 2, 1935, Margaret and Virginia were each given stocks, bonds, and cash of a value of $54,346.34 to Margaret and $36,954.68 to Virginia. On June 27, 1936, Margaret was given property appraised at $141,909.58 and Virginia property appraised at $139,-793.28. On January 9, 1937, Virginia was given property appraised at $48,456.21.

These values upon the gifts from 1934 to 1937, inclusive, are the appraised values appearing upon the Supplemental Inventory and Appraisement filed by Mrs. Tobias and Mr. Friendly, as Executrix and Executor of the estate of Alicia Lambourne, deceased. After filing that inventory they filed a petition to have those gifts excluded from consideration in fixing inheritance taxes for Mrs. Lambourne's estate. The State Tax Commission contested this, but lost in the lower court. Mrs. Lambourne had a gross estate of $657,892.37; a net estate of $617,318.54; and the executors conceded a tax of $57,181.85. This, of course, was figured without consideration of the gifts to the two girls.

During all of this time nothing was given to George, the grandson. Had it not been for Mr. Friendly, Mrs. Lambourne in her will, would not have treated George equally with his sisters, Margaret and Virginia. By her Will she made Mrs. Tobias and Mr. Friendly trustees for the three children, to retain the trust until each of the girls arrived

at the age of thirty-five, at which time each would receive her share; and to retain George's share until the trust was terminated.

Considerable testimony was introduced by Mrs. Tobias and Mr. Friendly upon the question of how the gifts came about.

There is little question but that at times, Mr. Friendly and Mrs. Tobias, especially the former, were thinking of inheritance taxes when they advised and encouraged transfers to the children. This was especially true in Mr. Friendly's advice about making the gifts out of Mrs. Lambourne's property instead of what she was to receive upon the distribution of her late husband's estate—this upon the theory that if Mrs. Lambourne should die within five years of her husband, the property from his estate would not be subject to another Federal inheritance tax. He was also thinking of taxes when he advised gifts each year believing that the Federal gift tax would be less. But, assuming all these thoughts of his were conveyed to Mrs. Lambourne and attributable to her, they are more consistent with a thought of escaping a rather large tax than with any apprehension of the inevitable.

The strongest point in favor of holding the 1936 and 1937 gifts as in contemplation of death, was the fact that in the late summer of 1935, Mr. Lambourne passed away. This was quite a shock to Mrs. Lambourne, and might reasonably have induced in her a thought that her time was limited, and thus impelled the gifts. Against this, however, is the evidence that this matter of gifts had been discussed between them all, prior to Mr. Lambourne's death, and partly carried out. Furthermore, had Mrs. Lambourne been impelled to distribute her property as the result of an apprehension of death, it is not unlikely she would have at least done a little something for George. There was no testimony justifying any conclusion that she was going to cut him off entirely. The fact that she ignored him, and showed such a preference for the girls, leads one to believe that her

thoughts were not upon death, but upon the then present financial status of the two girls. The 1937 gift to Virginia was no doubt, as testified to, to equalize her estate with that of Margaret. Mrs. Lambourne showed a great deal of confidence in Mr. Friendly and Mrs. Tobias, and appeared desirous of accepting their advice, to give to the girls property to educate them in looking after their affairs; but in spite of this confidence, in her two advisers, and in spite of the fact that they took the bulk of the responsibility in all her affairs, and those of her daughters, she would not act until she was assured that she would have plenty with which to do just as she pleased, the rest of her life. Considering her social activities, her good health, and her purchase of tickets for a trip east, but a few days before her death, we believe that Mrs. Lambourne was not contemplating death, either upon a false notion, or for cause, but rather she seemed quite interested in not being financially curtailed for the rest of her life—old in years, but not in spirit.

The decision of the lower court is affirmed. Costs to respondent.

MOFFAT, C. J., and LARSON and McDONOUGH, JJ., concur.

WOLFE, Justice (concurring).

I concur in the results.

The quotation which Mr. Justice PRATT takes from *United States* v. *Wells*, 283 U. S. 102, 117, 51 S. Ct. 446, 451, 75 L. Ed. 867, omits this sentence which is, to me, of considerable significance:

"It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers."

The Thompson case, 72 Utah 17, 269 P. 103 seems to adopt the rule that to make a gift inter vivos "in contemplation of death" it must be in contemplation of a death that is imminent or near at hand or believed by the donor so to be—it must be an "impending" death. See 72 Utah at pages 50,

62, 269 P. at pages 115, 119, and Note, 75 A. L. R. 545. I believe the intention of the legislature was that "contemplation of death" should mean that view of death which one has when he believes that death in a definite manner or from a definite cause or condition has been indicated for him or is likely and is within his contemplation as the impelling motive when the gift is made, whether he regard that death as "imminent," "threatening," "near at hand," or "impending" or not. The manner, cause or condition need not be one to which has been or can be assigned a name or description. If the Thompson case established a different rule I think it should be modified.

This proceeding to determine the amount of tax owing is equitable and our review is of all the evidence and to determine the preponderance. *In re Thompson Estate,* supra, at page 36 of 72 Utah, 269 P. at page 109. While I think advanced age makes the presumption of contemplation of death more difficult to rebut, I cannot say that the evidence here does not sustain the findings and judgment of the district court that these gifts were not made in contemplation of death as meant by Sec. 80-12-4. But I feel that each such case must be determined on its own facts, see *United States* v. *Wells,* supra, at page 119 of 283 U. S., 51 S. Ct. at page 452, 75 L. Ed. 867.

While in the rationale of certain cases illustrations may be very helpful as a guide to understanding, in cases of this nature they may so nearly fit actual situations which may come before us as to be in the nature of a commitment. I doubt the wisdom of using them here. One illustration is of a man to whose attention the uncertainty of life has been dramatically brought by an accident without injury. Such would only appear to be the general contemplation of death which the death of a friend might bring more vividly into consciousness but would not seem to be covered by Sec. 80-12-4.